1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

ADAMA JAMMEH, et al.,

CASE NO. C19-0620JLR

11

Plaintiffs,

ORDER GRANTING
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

v.

12

13

HNN ASSOCIATES, LLC, et al.,

14

Defendants.

15

## I.    INTRODUCTION

16

Before the court is Plaintiffs Adama Jammeh and Oumie Sallah's motion for class

17

certification under Federal Rule of Civil Procedure 23.  (*See* MFCC (Dkt. # 77)); *see also*

18

Fed. R. Civ. P. 23.  Defendants HNN Associates, LLC, and Gateway, LLC (collectively,

19

"HNN") oppose Plaintiffs' motion.  (HNN Resp. (Dkt. # 70).)  Defendants Columbia

20

Debt Recovery, LLC d/b/a Genesis Credit Management, LLC, and William Wojdak

21

(collectively, "CDR") also oppose Plaintiffs' motion.  (CDR Resp. (Dkt. # 54).)  The

22

court has considered the motion, the parties' submissions filed in support of and in

1   opposition to the motion, the relevant portions of the record, and the applicable law.

2   Being fully advised,[1] the court GRANTS Plaintiffs' motion based on the modified class

3   definitions as provided herein.

## II.   BACKGROUND

**A.   HNN**

6          HNN is the property manager for a low-income housing complex owned by

7   Defendant Gateway, LLC ("Gateway").  (SAC (Dkt. # 19) ¶¶ 3.2-3.3.)  HNN currently

8   manages "just over 6,000 apartment homes" in 28 apartment communities.  (4/16/20

9   Chandler Decl. (Dkt. # 55) ¶ 17, Ex. 16 ("Nored Dep.") at 7:15-8:12.)  Twenty-four of

10  those apartment communities accept only tenants qualified for the Low-Income Housing

11  Tax Credit ("LIHTC") program.  (*See id.* at 84:9-85:16.)  The owners or principals of

12  HNN "have some form of ownership" in all the communities that HNN manages.  (*Id.* at

13  11:23-12:2.)

14         HNN stores information pertaining to the complexes HNN manages and the

15  tenants who live in those complexes in a web-based system called Yardi.  (Nored Dep. at

16  43:13-49:24; *see also* 4/16/20 Chandler Decl. ¶ 3, Ex. 2 ("HNN 30(b)(6) Dep.")[2] at

17  56:14-25.)  Yardi is a primary technology tool for HNN and integral to HNN's business

---

19         [1] No party requests oral argument (*see* MFCC at title page; HNN Resp. at title page; CDR
    Resp. at title page), and the court does not consider oral argument to be helpful to its disposition
20  of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

21         [2] HNN's Federal Rule of Civil Procedure 30(b)(6) deposition appears at multiple places
    in the record.  (*See e.g.*, Neumann Decl. (Dkt. # 71) ¶ 3, Ex. B; 5/8/20 Chandler Decl. (Dkt. # 79)
22  ¶ 10, Ex. 37).)  Irrespective of where this deposition appears in the record, the court will cite to it
    as "HNN 30(b)(6) Dep."

1   operations.  (Nored Dep. at 44:11-16.)  All HNN properties in Washington State use

2   Yardi, and Yardi contains tenant information going back to at least 2014.  (*Id*. at 46:3-6,

3   45:20-23.)  Yardi also has sophisticated reporting capabilities, and HNN can engage an

4   outside company to generate custom reports.  (*Id*. at 47:1-49:20.)  HNN regularly obtains

5   Yardi reports that include information such as financial analytics concerning income

6   statements, financial performance, compliance, and delinquencies.  (*See id.* at 47:5-13.)

7   Further, it is possible to pull information from Yardi regarding individual tenants.  (*Id.* at

8   49:21-24.)

9        1.  Move-In Policies

10       HNN has a single Community Operations Manual ("the Manual") that is available

11  electronically to all employees.  (Nored Dep. at 64:21-23.)  HNN expects its employees

12  at all its communities to follow the Manual's procedures.  (HNN 30(b)(6) Dep. at

13  95:19-96:4, 179:5-16; 4/16/20 Chandler Decl. ¶ 18, Ex. 17 ("Dean Dep.") at 14:17-15:5.)

14  The Manual contains HNN's policies on subjects such as move-in and move-out.  (Nored

15  Dep. at 76:9-15.)  Most training on HNN's move-in and move-out policies is through the

16  Manual.  (*Id*. at 76:19-77:4.)

17       Prospective tenants must apply to live in an HNN apartment complex.  (*See* HNN

18  30(b)(6) Dep. at 28:12-29:23 (describing the general application process and stating

19  Plaintiffs went through this process).)  Prior to 2019, applicants completed a

20  questionnaire and a company known as "On-Site" screened applicants based on HNN's

21  "Resident Admission Standards."  (4/16/20 Chandler Decl. ¶ 19, Ex. 18 (attaching a copy

22  of HNN's Resident Admission Standards); HNN 30(b)(6) Dep. at 28:12-36:19

1  (describing the application process).)  All new tenants are required to pay a security

2  deposit of either $400.00 or $700.00 based on predetermined criteria.  (HNN 30(b)(6)

3  Dep. at 35:11-36:19.)  Plaintiffs signed a standard form lease that HNN used throughout

4  its communities until February 2019.  (*Id.* at 45:11-47:6.)  In February 2019, HNN hired

5  a different company to do tenant screening and changed its lease forms.  (Dean Dep. at

6  4:21-5:25, 9:17-22.)

7       The "Move-In/Move-Out Inspection Form" that HNN completed for Plaintiffs'

8  apartment unit is a form HNN used at its apartment communities until at least February

9  2019.  (HNN 30(b)(6) Dep. at 107:9-108:9.)  HNN attached a blank copy of this form to

10 Plaintiffs' lease.  (*See* 4/16/20 Chandler Decl. ¶ 20, Ex. 19 at HNN000346-47.)  In

11 February 2019, HNN replaced this form with a four-page checklist that calls for the input

12 of more detail concerning the condition of the unit at both move-in and move-out.  (*See*

13 *id.* ¶ 21, Ex. 20 (attaching a copy of the new form); HNN 30(b)(6) Dep. at

14 151:13-152:11.)  The Manual contains a policy requiring completion of a

15 Move-In/Move-Out Inspection Form when a tenant moves in.  (*See* 4/16/20 Chandler

16 Decl. ¶ 22, Ex. 21.)

17       2.  <u>Move-Out Policies and Records</u>

18       The Manual includes a policy titled "Move Out Process."  (*Id.* ¶ 23, Ex. 23; Dean

19 Dep. at 14:17-16:11.)  The Manual also includes documents titled "From Notice to

20 Vacate to Move Out," "Move Out Scenarios," and the Move-In/Move-Out Inspection

21 Form.  (4/16/20 Chandler Decl. ¶¶ 22, 24-25, Exs. 21, 23-24.)

22 //

1    HNN's "Move Out Scenarios" describes circumstances in which HNN requires a

2    resident to forfeit his or her security deposit.  (*See id.* ¶ 25, Ex. 24.)  HNN employees

3    used the chart to determine when a resident is required to forfeit a deposit for all leases

4    after July 2016.  (HNN 30(b)(6) Dep. at 179:17-182:23.)  According to this document,

5    HNN requires a tenant to forfeit his or her deposit when a tenant moves out because of an

6    eviction; when HNN issues a three-day, ten-day, or twenty-day notice to quit the

7    premises; or when a tenant gives less than 20 days of notice, abandons the unit, or moves

8    out during the first six months of a lease.  (4/16/20 Chandler Decl. ¶ 25, Ex. 24; *see also*

9    Dean Dep. at 45:15-49:11 (testifying about the forfeiture of Plaintiffs' deposit and that

10   HNN requires a tenant to forfeit his or her deposit when the tenant fails to comply with

11   the lease terms).)  Plaintiffs have identified 415 tenants who moved into a HNN

12   apartment between July 31, 2016, and February 1, 2019, and whose deposits HNN

13   forfeited.  (4/16/20 Boschen Decl. (Dkt. # 56) ¶ 18.)

14   HNN's "Move Out Accounting Process" requires that all tenants who are moving

15   out be processed in the same way.  (4/16/20 Chandler Decl. ¶ 26, Ex. 25.)  HNN

16   employees create a "Move-Out Packet" with four documents:  (1) a "Move Out

17   Accounting Cover Sheet," (2) a move out letter, (3) a move out statement, and (4) a

18   "Move-In/Move-Out Inspection Report."  (*Id.* at 3 (describing these items in the

19   Move-Out Packet at step nine of the "Move Out Accounting Process" document).)

20   HNN's corporate office had to approve a "Move-Out Packet" before it was sent to a

21   former tenant.  (*See id.*; *see also id.* ¶ 23, Ex. 22 at HNN000492 ("All move outs are sent

22   for approval <u>prior</u> to mailing and/or refunds being issued.").)

ORDER - 5

1    Starting at the end of 2015, HNN's corporate office entered the data from the

2    Move-Out Packets into Excel spreadsheets and called these Excel documents "Move-Out

3    Lists." (*See* Nored Dep. at 23:11-43:6 (discussing HNN Move-Out Lists).)  The 2019

4    Move-Out List contains data for every move-out from an HNN property in 2019. (*Id.* at

5    25:8-19.)  The 2019 Move-Out List includes the date of each move out, the date that the

6    HNN corporate office approved each Move-Out Packet and sent it back to the local

7    employee at the apartment complex or community, and data related to tenant

8    applications. (*Id.* at 28:3-23, 34:15-35:7.)

9    According to HNN policy, the date on which the HNN corporate office approved

10   the Move-Out Packet is the earliest date on which the local HNN employee could send

11   the Move-Out Packet to a tenant. (4/16/20 Chandler Decl. ¶ 26, Ex. 25 at 3 (describing

12   steps 9-11 of HNN's move-out procedure).)  Revised Move-Out Packets are noted as

13   revised in the data on the Move-Out Lists. (*See* Nored Dep. at 26:14-29:6.)  Based on

14   HNN's Move-Out Lists, Plaintiffs identified 531 tenants to whom HNN did not send a

15   move out statement until more than 21 days after they moved out. (4/16/20 Boschen

16   Dec. ¶ 29, Ex. C.)

17   **B.    CDR**

18   CDR is a debt collection company with primary collection portfolios consisting of

19   property management debt. (4/16/20 Chandler Decl. ¶ 16, Ex. 15 ("Engberg Dep.")[3] at

20   //

---

21   [3] Portions of Mr. Engberg's deposition appear at more than one place in the record. (*See,*

22   *e.g.*, 5/8/20 Chandler Decl. (Dkt. # 79) ¶ 6, Ex. 33.)  Irrespective of where Mr. Engberg's
deposition appears in the record, the court cites to his deposition as "Engberg Dep."

48:17-49:17.)  CDR merged with Genesis Credit Management ("Genesis"), and since

September 2017, CDR has done business under the name of Genesis.  (*Id.* at 7:20-8:15.)

CDR collected amounts HHN claimed against former tenants under a February 13, 2017,

Debt Collection Agreement between HNN and Genesis.  (4/16/20 Chandler Decl. ¶ 27,

Ex. 26.)  In February 2019, HNN contracted with a company called Debt Logic, which

continued to assign some HNN accounts to CDR for collection.  (Nored Dep. at

16:1-19:15.)

　　　　From February 2017 to February 2019, HNN contracted exclusively with CDR for

collections.  (*See* Dean Dep. at 33:6-16.)  HNN followed a standard process in assigning

accounts to CDR.  (*See id.* at 33:6-36:14.)  HNN emailed accounts for collection to one

of three email addresses at CDR.  (Engberg Dep. at 56:21-57:12.)  The information HNN

emailed to CDR included (1) a Move Out Accounting Cover Sheet, (2) the Move-Out

Statement, and (3) the Move-In/Move-Out Inspection Form.  (*Id.* at 161:16-25, 162:18-

165:7, 169:3-21; 4/16/20 Chandler Decl. ¶¶ 28, 30, Exs. 27, 29.)

　　　　CDR stores all HNN data in a software program known as "CollectOne."

(Engberg Dep. at 14:23-15:16.)  CDR's data entry department enters account information

into CollectOne, including the former tenant's name, social security number, telephone

number, and most recent address, the principal balance, the date HNN assigned the

account to CDR, and the date of the last charge.  (*Id.* at 56:4-20, 57:18-58:6.)  CDR stores

copies of the forms from HNN Move-Out Packets in CollectOne.  (*Id.* at 169:3-170:5.)

CDR uses codes for each client and can search its CollectOne system for all HNN

accounts using the HNN code.  (*Id.* at 64:6-9.)

1  CDR utilizes certain standard collection procedures.  For example, CDR generally

2  uses a three-digit code to identify its form letters.  (*Id.* at 34:5-6.)  In addition, CDR sends

3  a form "RO1 letter to every consumer on every account."  (*Id.* at 62:3-8.)  CDR sent an

4  RO1 letter to Plaintiffs.  (*Id.* at 61:23-63:3; 4/16/20 Chandler Decl. ¶ 13, Ex. 12.)  CDR's

5  data indicates that CDR attempted to collect from 1,986 former HNN tenants after March

6  2, 2017.  (Engberg Dep. at 173:9-188:13 (testifying about CDR's available data);

7  Chandler Decl. ¶ 32.)  CDR's data includes the amount of interest CDR charged and the

8  date from which CDR assessed the interest.  (*See* Engberg Dep. at 177:3-18.)

9  HNN assigns CDR principal amounts for collection, and CDR adds the interest

10  charges through CDR's CollectOne software.  (*Id.* at 72:7-16; Dean Dep. at 36:5-7

11  (testifying that HNN does not add interest to the accounts it assigns to CDR).)

12  CollectOne automatically calculates the interest that CDR demands in the RO1 letters

13  from the tenant's move out date.  (Engberg Dep. at 72:14-16; 172:6-9.)  A CDR

14  employee decides whether a payment is applied to principal, interest, or split in some way

15  between the two.  (*Id.* at 99:6-100:18.)  HNN does not provide guidance to CDR on how

16  CDR should apply a debtor's payments.  (*Id.* at 100:21-25.)  CDR retains a 35%

17  commission on non-legal accounts and remits the remaining amounts collected on

18  accounts to HNN with an itemized statement generated by CollectOne.  (*Id.* at

19  155:20-157:17.)

20  **C.**     **Plaintiffs' Tenancy at the Gateway Apartments & CDR's Collection Efforts**

21  Plaintiffs are sisters who emigrated from Gambia.  (MFCC at 4.)  Ms. Jammeh,

22  along with her sister, Ms. Sallah, applied for an apartment at the Gateway Apartments.

1    (HNN 30(b)(6) Dep. at 42:19-45:8.)  On September 6, 2017, Plaintiffs signed tax credit

2    documentation acknowledging that HNN could evict them for good cause, including for

3    violations of the lease.  (Neuman Decl. (Dkt. # 71) ¶ 2, 4-7, 10, Exs. A, C-F, I.)  Ms.

4    Jammeh signed the Resident Eligibility Application on which she represented that she did

5    not receive any child support or alimony/spousal payments.  (*Id.* ¶ 7, Ex. F.)  Ms.

6    Jammeh did not acknowledge a spouse anywhere on her paperwork.  (HNN 30(b)(6)

7    Dep. at 71:14-19.)  HNN accepted Plaintiffs' application, and Plaintiffs signed a lease

8    and paid a $700 deposit.  (*See* 4/16/20 Chandler Decl. ¶ 2, Ex. 1; HNN 30(b)(6) Dep. at

9    42:19-45:8.)  Plaintiffs moved into their Gateway apartment on September 28, 2017.

10   (HNN 30(b)(6) Dep. at 44:21-23.)

11        Plaintiffs' apartment was brand new, meaning no previous tenant had lived in it.

12   (Nored Decl. (Dkt. # 72) ¶ 3.)  HNN completed a Move-In/Move-Out Inspection Form

13   when Plaintiffs moved into their apartment.  (*See* 4/16/20 Chandler Decl. ¶ 4, Ex. 3.)  The

14   Move-In/Move-Out Inspection Form provides space to describe the following rooms or

15   spaces in the apartment:  living room/dining room, kitchen, bedroom, bathroom,

16   hall/closet, deck/patio/storage.  (*See id.*)  For the "Move In Inspection" on the Form, the

17   living room/dining room is described as "new carpet/new vinyl" and "no damages."  (*Id.*)

18   The kitchen is described as "new vinyl/new appliances" and "no damages."  (*Id.*)  The

19   remaining rooms or spaces are described as "no damages."  (*Id.*)

20        On January 22, 2018, Ms. Jammeh sent an email to the Gateway Apartments

21   office asking an HNN employee to print a letter to Gambian authorities regarding her

22   request for a divorce from Sarjo Sonko.  (*Id.* ¶ 5, Ex. 4.)  In 2005, Ms. Jammeh was

1    married to Mr. Sonko *in absentia* under sharia law in Gambia.  (*See id*. ¶ 6, Ex. 5 at 4.[4])

2    Mr. Sonko claims at least one other wife.  (*See id.*)  Numerous people informed Ms.

3    Jammeh that her proxy marriage under sharia law to Mr. Sonko was not legal in the

4    United States.  (*Id.*)

5          On January 24, 2018, Katie Long, an HNN employee and the Gateway

6    Community Manager, issued Plaintiffs a "3-Day Notice to Quit" the premises.  (*Id.* ¶ 7,

7    Ex. 6; *see also* Neumann Decl. ¶¶ 15-16, Exs. N-O.)  The notice states that Plaintiffs

8    must surrender possession of the apartment within three days because Ms. Jammeh failed

9    to disclose that she had a spouse in paperwork she filled out when she applied to rent a

10   Gateway apartment.[5]  (*See* 4/16/20 Chandler Decl. ¶ 7, Ex. 6.)  The notice also states that

11   if Plaintiffs failed to surrender the premises, HNN would institute judicial proceedings to

12   obtain Plaintiffs' eviction.  (*See* 4/16/20 Chandler Decl. ¶ 7, Ex. 6.)

13         On the day she was served with the notice, Ms. Jammeh went to the Gateway

14   Apartments office to explain to Ms. Long that "she was not legally married in the United

15   States."  (*Id.* ¶ 8, Ex. 7.)  On January 29, 2018, Snohomish County Legal Services sent

16   Ms. Long a letter explaining the same thing.  (*Id.* ¶ 9, Ex. 8.)  HNN did not rescind the

17   notice.  (HNN 30(b)(6) Dep. at 72:19-86:8 (testifying that Ms. Jammeh could have

18   waited until HNN filed an eviction proceeding and then explained to the court why she

19

20         _____

           [4] The court cites to the page number generated by the court's electronic filing system in
     this exhibit.

21         [5] Ms. Long also believed that the letter she printed for Ms. Jammeh referenced income
     that Ms. Jammeh had not disclosed on her paperwork when she applied for the apartment.  (*See*
22   HNN 30(b)(6) Dep. at 84:14-18.)

1  disagreed with HNN's determination that she failed to disclose a marriage on her

2  application paperwork).)  On February 5, 2018, Plaintiffs moved out of their Gateway

3  apartment to avoid an eviction proceeding.  (*See id.* ¶ 6, Ex. 5 at 6; HNN 30(b)(6) Dep. at

4  196:1-3.)  On February 5-6, 2018, HNN conducted an inspection of Plaintiffs' apartment

5  and noted damage on Move-In/Move-Out Inspection Form, along with photographs.

6  (Neumann Decl. ¶¶ 9, 18, Exs. H, Q.)

7        HNN maintains that it mailed Plaintiffs a letter, dated February 27, 2018, stating

8  that Plaintiffs owed $14,919.11 to HNN.  (HNN 30(b)(6) Dep. at 195:17-20; 4/16/20

9  Chandler Decl. ¶ 10, Ex. 9 at 5.[6])  HNN sent the letter to Plaintiffs 22 days, rather than

10 the required 21 days, after Plaintiffs' moved out because Ms. Long suffered a broken arm

11 and could not work for two weeks.  (HNN 30(b)(6) Dep. at 196:4-14); *see also* RCW

12 59.18.280(1).  The letter includes a "Move-Out Statement" listing several charges,

13 including a forfeiture of Plaintiffs' entire $700.00 security deposit, $11,702.00 in future

14 rent, utility charges, and over $1,000.00 in cleaning and repair charges.  (4/16/20

15 Chandler Decl. ¶ 10, Ex. 9 at 6.[7])

16       On March 9, 2018, HNN sent a revised statement demanding payment of

17 $3,286.58.  (*Id.* ¶¶ 11-12, Exs. 10-11; Neumann Decl. ¶¶ 20-21, Exs. S-T.)  HNN's

18 revised statement reduced the amount of the future rent charge to approximately three

19 //

20

21       [6] The court cites to the page number generated by the court's electronic filing system in this exhibit.

22       [7] The court cites to the page number generated by the court's electronic filing system in this exhibit.

1  weeks because HNN re-rented the unit on March 1, 2019.  (HNN 30(b)(6) Dep. at

2  201:25-202:7; Neumann Decl. ¶ 22, Ex. U.)  HNN continued to demand the forfeiture of

3  Plaintiffs' entire $700.00 security deposit, applying no part of it to the balance HNN

4  claimed Plaintiffs owed.  (4/16/20 Chandler Decl. ¶ 12, Ex. 11 at 4[8] (noting "Forfeited

5  deposit" of $700.00).)

6          On March 22, 2018, CDR sent Plaintiffs a collection letter demanding $3,286.58

7  in principal and an additional $48.62 in interest.  (*Id.* ¶ 13, Ex. 12.)  CDR calculated the

8  interest at 12% starting on the February 5, 2019—Plaintiffs' move-out date.  (*See id.*)

9  CDR attempted to collect these amounts by making numerous calls to Plaintiffs.  (*Id.*

10  ¶¶ 14-15, Ex. 13 at 4;[9] Ex. 14.)  Ultimately, Plaintiffs paid CDR $2,629.26.  (Answer

11  (Dkt. # 31) ¶ 4.32 (admitting Plaintiffs paid Defendants $2,629.26).)  CDR maintains that

12  the amount Plaintiffs paid did not represent a charge for any interest.  (*See* CDR Resp. at

13  13 (citing 4/16/20 Wojdak Decl. (Dkt. # 53) ¶ 9, Ex. E at CDR0006 (including the

14  05/23/2018 entry of Plaintiffs' account records, which states "2629.26 lowest w/ waiving

15  interest")).)

16  //

17  //

18  //

19  //

---

[8] The court cites to the page number generated by the court's electronic filing system in this exhibit.

[9] The court cites to the page number generated by the court's electronic filing system in this exhibit.

1    **D.    Plaintiffs' Claims**

2            Plaintiffs seek class certification for their first, second, third, and fourth causes of

3    action.[10]  (*See* MCC at 2-3; *see also* SAC ¶¶ 6.1-6.56.)  Plaintiffs' first cause of action is

4    against CDR for allegedly attempting to collect interest not legally due in violation of the

5    Washington Collection Agency Act ("CAA"), RCW 19.16.250(2), which is a *per se*

6    violation of the Washington Consumer Protection Act ("CPA"), RCW ch. 19.86.  (*See*

7    SAC ¶¶ 6.1-6.16); *see also* RCW 19.16.440 ("[T]he commission by a licensee or an

8    employee of a licensee of an act or practice prohibited by RCW 19.16.250 . . . [is]

9    declared to be [an] unfair act[] or practice[] or unfair method[] of competition in the

10   conduct of trade or commerce for the purpose of the application of the [CPA].").

11           Plaintiffs' second cause of action is against CDR and CDR's President William

12   Wojdak for collecting or attempting to collect interest not legally due in violation of the

13   Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*  (*See* SAC

14   ¶¶ 6.17-6.35.)

15           Plaintiffs' third cause of action is against HNN for their allegedly unfair acts under

16   the CPA.[11]  (*See id.* ¶¶ 6.36-6.50; *see also* MCC at 3.)

17   //

18

19           [10] Plaintiffs do not seek class certification of their Fifth and Sixth causes of action for
     unjust enrichment and civil conspiracy.  (*See* MCC at 4; *see also* SAC ¶¶ 6.57-6.65.)  Indeed, the
20   court has granted summary judgment to Defendants on these causes of action.  (*See* 6/4/20 Order
     (Dkt. # 83) at 2.)

21           [11] In their second amended complaint, Plaintiffs allege this cause of action against all
     Defendants.  (*See* SAC ¶¶ 6.36-6.50.)  However, in their motion for class certification, Plaintiffs
22   stated that this cause of action is "against HNN and Gateway."  (*See* MCC at 3.)

1    In their fourth cause of action, Plaintiffs allege two violations of Washington's

2   Residential Landlord Tenant Act ("RLTA"), RCW ch. 59.18, against HNN, for which

3   Plaintiffs seek class certification.  (*See* SAC ¶¶ 6.51-6.56.)  First, Plaintiffs allege that

4   HNN violated the RLTA by collecting security deposits without providing "a written

5   checklist or statement specifically describing the condition and cleanliness of or existing

6   damages to the premises and furnishings, including, but not limited to, walls, floors,

7   countertops, carpets, drapes, furniture, and appliances."  (*See* SAC ¶ 6.52 (quoting RCW

8   59.18.260).)  Plaintiffs allege that because HNN collected Plaintiffs' $700.00 deposit

9   without providing an adequate checklist, HNN is liable to Plaintiffs for the deposit.  (*See*

10  *id.*)  Second, Plaintiffs allege that HNN violated the RLTA by failing to send out move

11  out statements explaining the basis for retaining Plaintiffs' security deposit within 21

12  days after Plaintiffs moved out.  (*See id.* ¶ 6.54 (quoting RCW 59.18.280).)

13  **E.    Plaintiffs' Putative Classes**

14   In their second amended complaint, Plaintiffs sought to certify the following

15  classes:

16   **HNN CLASS**: All former tenants of an HNN managed property in
     Washington against whom HNN

17

18   (1) collected a deposit or security without providing a move-in checklist that
     complies with the requirements of RCW 59.18.260; and/or

19   (2) retained all or part of a security deposit without providing a statement of
     its basis for retaining the deposit in the time and manner required by RCW

20   59.18.280; and/or

21   (3) assessed additional fees based on a Move-Out inspection without
     allowing the tenant the opportunity to be present at the inspection or to

22   dispute HNN's inspection findings.

**[CDR] CLASS**: All members of the HNN Class from whom [CDR] collected, or attempted to collect the move-out charges referred by HNN and/or charged interest on claimed amounts that were calculated from a time before the amounts had become liquidated.

(SAC (Dkt. # 19) ¶ 5.1.)

However, in their motion for class certification, Plaintiffs modify their requests for class certification as follows:

**HNN CLASSES**: Former tenants of an HNN managed property in Washington who moved in before February 1, 2019 and:

(1) who moved out on or after March 7, 2017, and from whom HNN collected a deposit or security without providing a move-in checklist that stated the condition of the walls, floors, countertops, carpets, and appliances in the unit (the "Move-In Form" Class); or

(2) who moved out on or after March 7, 2017, and to whom HNN mailed a statement of HNN's basis for retaining a deposit more than 21-days after the tenant moved out of an HNN-managed unit (the "Late Statement" Class); or

(3) who moved into an HNN managed property after July 31, 2016, and whose deposit was forfeited by HNN (the "Forfeiture Class").

**[CDR] CLASS**: All former tenants of an HNN managed property in Washington whose accounts were placed with [CDR] between February 13, 2017, and January 31, 2019, and to whom [CDR] sent at least one written collection demand.

(MCC at 11.)

The court now considers Plaintiffs' motion.

## III.    ANALYSIS

### A.    Standards for Class Certification

Plaintiffs seeking class certification bear the burden of demonstrating that they meet "each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least

1    one of the requirements of Rule 23(b)." *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 512

2    (9th Cir. 2013); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

3    A district court may certify a class only if all of the requirements of Federal Rule of Civil

4    Procedure 23(a) are met, including: "(1) the class is so numerous that joinder of all

5    members is impracticable; (2) there are questions of law or fact common to the class; (3)

6    the claims or defenses of the representative parties are typical of the claims or defenses of

7    the class; and (4) the representative parties will fairly and adequately protect the interests

8    of the class." Fed. R. Civ. P. 23(a); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122

9    (9th Cir. 2010). These Rule 23(a) prerequisites are often referred to in shorthand as

10   numerosity, commonality, adequacy, and typicality. *See Mazza v. Am. Honda Motor Co.*,

11   666 F.3d 581, 588 (9th Cir. 2012). Certification is proper "only if 'the trial court is

12   satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

13   satisfied.'" *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011) (quoting

14   *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

15          In addition to meeting the Rule 23(a) prerequisites, the party seeking class

16   certification must also fall into one of three categories under Rule 23(b). *Zinser v.*

17   *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d

18   1266 (9th Cir. 2001). Here, Plaintiffs seek class certification under Rule 23(b)(3) on the

19   basis that "questions of law or fact common to class members predominate over any

20   questions affecting only individual members, and that a class action is superior to other

21   available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

22   23(b)(3).

1    "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350.

2    "A party seeking class certification must affirmatively demonstrate his compliance with

3    [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently

4    numerous parties, common questions of law or fact, etc." *Id.* "[S]ometimes it may be

5    necessary for the court to probe behind the pleadings before coming to rest on the

6    certification question." *Id.* (quoting *Falcon*, 457 U.S. at 160). "The class determination

7    generally involves considerations that are enmeshed in the factual and legal issues

8    comprising the plaintiff's cause of action." *Id.* (quoting *Falcon*, 457 U.S. at 160).

9    Nevertheless, although the court must engage in a "rigorous" analysis of the Rule 23

10   requirements, "[m]erits questions may be considered to the extent—but only to the

11   extent—that they are relevant to determining whether the Rule 23 prerequisites for class

12   certification are satisfied." *Amgen Inc. v. Ret. Plans & Trust Funds*, 568 U.S. 455, 466

13   (2013). If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have

14   been met, the court should deny class certification. *Falcon*, 457 U.S. at 161.

15   **B.    Preliminary Issues Concerning Plaintiffs' Class Descriptions**

16        Both HNN and CDR raise threshold objections concerning Plaintiffs' revised class

17   definitions. The court will address the objections of HNN and CDR, respectively.

18        1.  <u>HNN's Objections to Plaintiffs' Class Definitions</u>

19        HNN raises three preliminary objections to Plaintiffs' HNN Classes. First, HNN

20   argues that Plaintiffs' Forfeiture Class is improper because it was not alleged in

21   Plaintiffs' second amended complaint, which added Plaintiffs' class action allegations.

22   (HNN Resp. at 5-8.) Second, HNN argues that Plaintiffs' class periods for the Move-In

Form Class and Late Statement Class are improper.  (*Id.* at 8.)  Third, HNN maintains

that Plaintiffs' Move-In Form Class is overbroad on its face because it includes putative

class members whose purported claims have been barred for nearly a decade or more.

(*Id.* at 8-9.)

　　　　　a.　The Forfeiture Class

HNN asserts that Plaintiffs failed to place HNN on notice in Plaintiffs' second

amended complaint of a putative class of former tenants who HNN claimed forfeited

their security deposits.  (*See id.* at 8.)  HNN also argues that Plaintiffs' second amended

complaint failed to put HNN on notice that HNN's lease terms which require a tenant to

forfeit his or her security deposit in certain circumstances violates the CPA.  (*See id.*)

HNN argues that, although Plaintiffs may be able to narrow the scope of their alleged

classes, they may not broaden the alleged classes nor assert unpled classes in their motion

for class certification.  (*See id.* at 6-8.)

District courts in the Ninth Circuit are split over whether a plaintiff is bound by

the class definition set out in her complaint.  *See Grodzitsky v. Am. Honda Motor Co*.,

No. 12-cv-01142-SVW, 2014 WL 718431, at *4 (C.D. Cal. Feb. 19, 2014) (collecting

cases).  Some courts strictly adhere to class definitions provided in the operative

complaint and require plaintiffs to amend their complaint before certifying a different

class.  *See Berlowitz v. Nob Hill Masonic Mgmt.*, No. 96-cv-01241-MHP, 1996 WL

724776, at *2 (N.D. Cal. Dec. 6, 1996) ("The court is bound by the class definition

provided in the complaint [and] will not consider certification of the class beyond the

definition provided in the complaint unless plaintiffs choose to amend it."): *see also*

1   *Costelo v. Chertoff*, 258 F.R.D. 600-05 (C.D. Cal. 2009) ("The Court is bound to class

2   definitions provided in the complaint and, absent an amended complaint, will not

3   consider certification beyond it.").  Other courts permit plaintiffs to narrow a proposed

4   class at the certification stage without amending the complaint.  *See, e.g.*, *Abdeljalil v.*

5   *Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015); *Knutson v. Schwan's*

6   *Home Servs., Inc.*, 2013 WL 4774763 at *10-13 (S.D. Cal. Sep. 5, 2013).  Finally, a third

7   group of district courts permit plaintiffs to modify the proposed class so long as the

8   "proposed modifications are minor, require no additional discovery, and cause no

9   prejudice to defendants."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583,

10   590–91 (N.D. Cal. 2010); *see also J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL

11   415579, at *5 (N.D. Cal. Feb. 1, 2019) (adopting the third approach).

12          Plaintiffs argue that the court should consider their new Forfeiture Class because it

13   is narrower than the class definition contained in their second amended complaint or is

14   merely a subset of it.[12]  (HNN Reply at 2-3.)  Specifically, Plaintiffs argue that their new

15   Forfeiture Class is narrower than their earlier proposed class of tenants to whom HNN

16   allegedly charged excessive fees at move out without allowing the tenants an opportunity

17   _____

18   [12] Plaintiffs also maintain that their second amended complaint sufficiently notified HNN
that their CPA claim challenged HNN's practice of forcing tenants to forfeit their security
19   deposits.  (HNN Reply (Dkt. # 78) at 1-3.)  Specifically, Plaintiffs' CPA claim states that HNN's
unfair and deceptive practices included:  "Forcing Plaintiffs and class members to vacate their
apartments, and then retaining their respective security deposits."  (SAC ¶ 6.40(b).)  Plaintiffs
20   also alleged that "HNN ha[d] a common practice of forfeiting the security deposits of tenants it
ha[d] forced to vacate by terminating their tenancy."  (*Id.* ¶ 4.35.)  Finally, Plaintiffs specifically
21   alleged that HNN forced them to forfeit their own $700.00 security deposit.  (*Id.* ¶¶ 1.3, 4.19,
4.21.)  The court agrees that these allegations placed HNN on adequate notice that HNN's lease
22   terms, which require a tenant to forfeit his or her security deposit in certain circumstances,
allegedly violated the CPA.

1    to be present at the move out inspection or to dispute HNN's inspection findings.  (*Id.* at

2    2; *see also* SAC ¶ 5.1.)  The court agrees that the new Forfeiture Class is smaller in size

3    and that some aspects of the new Forfeiture Class are narrower than the prior described

4    class.  Nevertheless, the new Forfeiture Class does not require that HNN disallow any

5    opportunity to be present at the move out inspection or to dispute HNN's inspection

6    findings and this alters and potentially enlarges the scope of the new Forfeiture Class in

7    some respects.  (*See* MCC at 11.)

8         Despite these modest differences, the court rejects HNN's objections to class

9    certification based on changes in the class definition.  Like the third group of district

10   courts described above, this court adopts an approach that permits modest modifications

11   to the class definition so long as the proposed modifications are minor, require no

12   additional discovery, and cause no prejudice to defendants.  *See In re TFT-LCD (Flat*

13   *Panel) Antitrust Litig.*, 267 F.R.D. at 590-91; *J.L.*, 2019 WL 415579, at *5.  This is the

14   most appropriate test because instead of setting artificial limits based on allegations that

15   are drafted prior to class discovery or an amorphous determination that the newly

16   described class definition is "narrower" than the first, this test looks at the practical

17   impacts that the new class definition will have on the opposing party and the conduct of

18   the litigation in general.

19        Nowhere does HNN assert that Plaintiffs' modest alterations to the Forfeiture

20   Class definition will prejudice HNN, create additional discovery burdens, or require

21   modification of the case schedule.  (*See* HNN Resp. at 7-8.)  These factors are pivotal in

22   the court's view.  Indeed, as Plaintiffs point out, the parties have already been conducting

1    litigation as if the Forfeiture Class were at issue.  HNN has produced substantial

2    information to Plaintiffs about members of the Forfeiture Class.  (*See* 4/16/20 Boschen

3    Decl. ¶¶ 14-18 (describing Plaintiffs' counsel's analysis of HNN documents produced to

4    identify member of the proposed Forfeiture Class).)  Further Plaintiffs deposed HNN's

5    representatives about HNN's forfeitures of tenants' security deposits.  (*See* 5/8/20

6    Chandler Decl. (Dkt. # 79) ¶ 11, Ex. 38 (attaching Rule 30(b)(6) notice which seeks

7    testimony concerning HNN's "POLICIES RELATING TO the refund of security

8    deposits to TENANTS after they move out, including, but not limited to, [HNN's]

9    forfeiture of security deposits"); *see also* Dean Dep. at 45:15-49:11.)  Finally, HNN

10   propounded a contention interrogatory and sought documents from Plaintiffs related to

11   paragraph 4.35 of the second amended complaint in which Plaintiffs allege HNN's

12   common practice regarding forfeitures.  (*See* 5/8/20 Chandler Decl. ¶ 3, Ex. 32 at 3[13]; *see*

13   *also* SAC ¶ 4.35.)  Because Plaintiffs' proposed alterations to the class definition are

14   modest, the parties have already conducted substantial discovery related to the Forfeiture

15   Class, and HNN does not assert that additional discovery or prejudice will result, the

16   court rejects HNN's objection based on the scope of the Forfeiture Class.  The court,

17   therefore, will consider whether the Forfeiture Class meets the requirements of Rule 23.

18             b.  *Class Periods for the Move-In Forms and the Late Settlement Classes*

19             HNN argues that Plaintiffs use an incorrect date for the putative class periods of

20   the Move-In Form Class and the Late Statement Class, both of which are based on

21   _____

22   [13] The court cites to the page number generated by the court's electronic filing system in
     this exhibit.

1    alleged violations of the RLTA, RCW ch. 59.18.  (HNN Resp. at 8; *see* SAC ¶¶ 5.1,

2    6.51-6.56.)  Plaintiffs admit that the RLTA is governed by a two-year statute of

3    limitations, and Plaintiffs define the class period for these two classes as beginning on

4    March 7, 2017, which is two years prior to the filing of the state court complaint.  Yet, as

5    HNN points out, this action comprised no RLTA claims until July 12, 2019, when

6    Plaintiffs filed their motion for leave to file their second amended complaint.  (HNN

7    Resp. at 8.)  Plaintiffs agree that the requirements for relation back of the amendments

8    are not met here and that the start date for the Move-In Form and Late Statement Classes

9    should be altered from March 7, 2017, to July 12, 2017, which is two years prior to the

10   filing of Plaintiffs' second amended complaint.  (*See* HNN Reply at 3; *see also* SAC.)

11   Accordingly, in conformity with HNN's response and Plaintiffs' reply, the court alters

12   the starting date of these two classes from March 7, 2017, to July 12, 2017.[14]  *See Borum*

13   *v. Brentwood Vill., LLC*, 324 F.R.D. 1, 8 (D.D.C. 2018) ("When appropriate, district

14   courts may redefine classes or subclasses sua sponte prior to certification.").

15           *c.  Breadth of the Move-In Forms Class*

16           HNN argues that Plaintiffs' definition of the Move-In Forms Class is "grossly

17   overbroad" because Plaintiffs define the class as any former tenant who *moved out* of an

18   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

19      [14] Plaintiffs state in their reply memorandum that the issue of whether the RLTA should
     be governed by a two-year or a three-year statute of limitations is presently before the
     Washington Supreme Court, and Plaintiffs ask the court to change the starting date of these two
20   classes to July 12, 2016, should the Washington Supreme Court determine that the RLTA is
     governed by a three-year statute of limitations.  (*See* HNN Reply at 3.)  The court, however, will
21   not *sua sponte* alter the class periods in response to a ruling of the Washington Supreme Court.
     If Plaintiffs believe that the class periods should be altered for any reason in the months to come,
     they must so move the court at that time and allow Defendants an appropriate opportunity to
22   respond.

HNN property on or after July 12, 2017,[15] and did not receive a certain type of "move-in checklist." (HNN Resp. at 8-9.) HNN argues that the date on which the tenant moved out is irrelevant because Plaintiffs' RLTA cause of action under RCW 59.18.260 accrues "when a tenant pays a security deposit without a written statement when their tenancy began." (*Id.* at 9.) Thus, HNN argues that, because Plaintiffs filed their second amended complaint on July 12, 2019 (*see* SAAC), any tenant who moved into an HNN property on or before July 11, 2017, is barred from bringing a claim under RCW 59.18.260. (*Id.*)

The court disagrees. A cause of action accrues and the limitations period begins to run "when a party has the right to apply to the court for relief," meaning that "'the plaintiff can establish each element of the action.'" *Shepard v. Holmes*, 345 P.3d 786, 790 (Wash. Ct. App. 2014) (quoting *Hudson v. Condon*, 6 P.3d 615, 620 (Wash. Ct. App. 2000)). In pertinent part, RCW 59.18.260 provides:

> No deposit may be collected by a landlord unless the rental agreement is in writing and a written checklist or statement specifically describing the condition and cleanliness of or existing damages to the premises and furnishings, including, but not limited to, walls, floors, countertops, carpets, drapes, furniture, and appliances, is provided by the landlord to the tenant at the commencement of the tenancy. . . . No such deposit shall be withheld on account of normal wear and tear resulting from ordinary use of the premises. . . . If the landlord collects a deposit without providing a written checklist at the commencement of the tenancy, the landlord is liable to the tenant for the amount of the deposit . . . .

RCW 59.18.260. Neither party provided any case authority concerning when the limitations period begins to run on this provision. (*See* HNN Resp. at 8-9; HNN Reply at

//

---

[15] Plaintiffs use March 7, 2017 (*see* MCC at 11), but the court altered this date to July 12, 2017, *see supra* § III.B.1.b.

3-4.)  Nevertheless, the court concludes that the two-year limitations period applicable to RCW 59.18.260 begins to run when the tenant moves out—not when the tenant moves in. A tenant does not suffer the harm that RCW 59.18.260 is designed to prevent—and thus could not establish any damages—until the end of the tenancy when a landlord retains all or a portion of the tenant's deposit.  If the limitations period ran from the time the tenant moved in and the tenant stayed in the rental for more than two years, the tenant would lose the ability to enforce this provision of the RLTA if the landlord improperly withheld the tenant's security deposit, rendering the provision toothless.  The court declines to adopt such an interpretation.  Accordingly, the court rejects HNN's objection to the Move-In Class as overly broad because it runs from when a tenant moves out of an HNN property rather than when a tenant moves in.

2.   CDR's Objections to Plaintiffs' Class Definitions

CDR argues that Plaintiffs' revised definition of the CDR Class impermissibly enlarges the class.  (CDR Resp. at 16-19.)  Plaintiffs' current definition of the CDR Class includes:  "All former tenants of an HNN managed property in Washington whose accounts were placed with [CDR] between February 13, 2017, and January 31, 2019, and to whom [CDR] sent at least one written collection demand."  (MCC at 11.)  CDR argues that this definition is impermissibly overbroad because "a purported class member could have been a former tenant of an HNN property and had an account referred to [CDR] by an entity other than HNN, but they would still be a class member under this definition." (CDR Resp. at 18.)  CDR argues that "[t]his current definition would require an investigation into what entity referred the account to [CDR], identify [sic] the debt being

1   collected, and whether any potential injury was consistent with Plaintiffs' claimed

2   injury." (*Id.* at 18-19.)  The court agrees that Plaintiffs' use of the passive voice, which

3   fails to clearly identify the entity that is assigning accounts to CDR, creates an ambiguity

4   in Plaintiffs' CDR Class definition that requires modest modification.  Nevertheless, as

5   discussed below, the court finds CDR's argument that it was misled as to the intended

6   scope of Plaintiffs' CDR Class to be disingenuous.

7          Plaintiffs respond that when they learned in discovery that HNN contracted with

8   CDR to collect from former tenants from February 13, 2017, to February 2019, they

9   modified the class period accordingly to narrow the class.  (CDR Reply at 1-2.)  Plaintiffs

10  also agree that, to the extent their new class definition can be read to include accounts

11  assigned to CDR by an entity other than HNN, the class definition requires modification.

12  They suggest replacing the word "were" with "HNN" as follows:  "All former tenants of

13  an HNN managed property in Washington whose accounts HNN placed with [CDR]

14  between February 13, 2017, and January 31, 2019, and to whom [CDR] sent at least one

15  written collection demand."  (CDR Reply at 2.)  The court agrees that this minor

16  modification adequately addresses the issues raised by CDR concerning the class

17  definition.

18          In any event, the court does not find credible CDR's argument that it believed that

19  Plaintiffs were attempting to broaden the CDR Class to include all kinds of debt referred

20  by any creditor, "includ[ing] medical debts, legal debts, and other retail debts."  (See

21  CDR Resp. at 18 19, 21.)  Such a class would be entirely inconsistent with Plaintiffs'

22  briefing (*see generally* MCC) and would be constitute an absurdity.  Although the court

1    agrees that the word "were" in the CDR Class definition should be replaced with "HNN"

2    for clarity, the court finds CDR's argument that it was misled concerning the intended

3    breadth of the CDR Class or prejudiced by its "misunderstanding" to be disingenuous.[16]

4    Thus, the court alters the CDR Class definition in the manner suggested in Plaintiffs'

5    reply memorandum and will consider the revised definition under the standards set forth

6    in Rule 23. *See, e.g.*, *Lundquist v. Sec. Pac. Automotive Fin. Servs. Corp.*, 993 F.2d 11,

7    14 (2d Cir. 1993) ("[T]he district court is not bound by the class definition proposed in

8    the complaint and should not dismiss the action simply because the complaint seeks to

9    define the class too broadly." (internal quotations and citations omitted)); *Victorino v.*

10   *FCA US LLC*, 326 F.R.D. 282, 301-02 (S.D. Cal. 2018) ("It is to be noted that district

11   courts have the inherent power to modify overbroad class definitions.") (citing cases);

12   *Snipes v. Dollar Tree Distrib., Inc.*, No. 2:15-CV-00878-MCE-DB, 2019 WL 5830052, at

13   *5 (E.D. Cal. Nov. 7, 2019) ("The Court may properly . . . cure any defect contained

14   within a class definition."); *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev.

15   //

16   —————————————

     [16] CDR also complains that the new definition could include accounts where CDR
17   attempted to collect something other than move-out costs. (CDR Resp. at 19.) However, there is
     no evidence, nor does CDR suggest, that CDR collected amounts on behalf of HNN that were
18   unrelated to move-out costs. (*See id.* at 18-19.) CDR also suggests that the class definition is
     overly broad because it may include accounts "for which [CDR] has obtained a judgment" and
19   that, therefore, are subject to the affirmative defense of *res judicata*. (*Id.* at 19.) However, this is
     an issue that should be addressed in the context of "predominance" under Rule 23(b)(3). *See*
20   *Victorino v. FCA US LLC*, No. 16CV1617-GPC(JLB), 2020 WL 2306609, at *4 (S.D. Cal. May
     8, 2020) ("[W]hen 'one or more of the central issues in the action are common to the class and
21   can be said to predominate, the action may be considered proper under Rule 23(b)(3) even
     though other important matters will have to be tried separately, such as damages or some
     affirmative defenses peculiar to some individual class members.'") (quoting *Tyson Foods, Inc. v.*
22   *Bouaphakeo*, --- U.S. ---, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M.
     Kane, Federal Practice and Procedure § 1778, pp. 123-24 (3d ed. 2005)).

1    1985) (noting that "many circuits have held that the court itself may construct a definition

2    of a class . . . or may modify a proposed definition where the original is inadequate," and

3    adopting a judicially modified class definition).

4    **C.     Rule 23(a) Prerequisites**

5         As noted above, the Rule 23(a) prerequisites are often described, in shorthand, as

6    numerosity, commonality, adequacy, and typicality.  *See Mazza*, 666 F.3d at 588.  The

7    court will address the Rule 23(a) prerequisites for the HNN Classes and the CDR Class in

8    turn.

9         1.   HNN Classes

10        HNN does not dispute that the proposed HNN Classes satisfy the Rule 23(a)(1)

11   numerosity requirement, the Rule 23(a)(2) commonality requirement, or the Rule

12   23(a)(4) adequacy requirement concerning class counsel.  (*See generally* HNN Resp.)

13   The court has examined Plaintiffs' proffer concerning these prerequisites and agrees that

14   Plaintiffs meet their burden of demonstrating these Rule 23(a) prerequisites for the HNN

15   Classes.  Accordingly, the court addresses only HNN's challenges to the Rule 23(a)(3)

16   typicality prerequisite and the adequacy of Plaintiffs as class representatives under Rule

17   23(a)(4).

18        *a.  Adequacy of Plaintiffs as Class Representatives*

19        The Rule 24(a)(4) adequacy requirement "serves to uncover conflicts of interest

20   between named parties and the class they seek to represent."  *Amchem Prods., Inc. v.*

21   *Windsor*, 521 U.S. 591, 625-26 (1997).  "[A] class representative must be part of the class

22   and 'possess the same interest and suffer the same injury' as the class members."  *E. Tex.*

1 | *Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403(1977) (quoting *Schlesinger v.*

2 | *Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).  Plaintiffs argue that they

3 | have demonstrated that they are adequate class representatives because they have

4 | participated in counsel's investigation, in reviewing and approving the complaints, and

5 | producing responses to supplemental responses to written discovery.  (*See* MCC at 17

6 | (citing 4/16/20 Chandler Decl. ¶¶ 40-41).)

7 | HNN responds that Plaintiffs fail to satisfy their burden because the evidence upon

8 | which Plaintiffs rely relates not to their own adequacy as class representatives, but to the

9 | adequacy of their counsel, and Plaintiffs failed to submit their own declarations or

10 | affidavits.  (HNN Resp. at 10-11.)  HNN presents no evidence of Plaintiffs' inadequacy

11 | as class representatives or any conflict of interest; instead, HNN relies on Plaintiffs'

12 | burden of demonstrating the appropriateness of class certification and their failure to

13 | submit their own declarations demonstrating their adequacy as class representatives.  (*See*

14 | *id.*)

15 | Because HNN challenges the sufficiency of their showing, Plaintiffs submit

16 | additional declarations with their reply memorandum.  (*See* HNN Reply at 4-5 (citing

17 | 5/8/20 Chandler Decl. ¶ 4; Jammeh Decl. (Dkt. # 81); Sallah Decl. (Dkt. # 82)).)  The

18 | evidence demonstrates that Plaintiffs understand their responsibilities as class

19 | representatives (Jammeh Decl. ¶ 3; Sallah Decl. ¶ 3), and that they have stayed in regular

20 | contact with their counsel from the pre-complaint investigation to the present and have

21 | assisted in responding to Defendants' written discovery and in supplementing those

22 | responses numerous times (5/8/20 Chandler Decl. ¶ 4; Jammeh Decl. ¶ 4; Sallah Decl.

¶ 4).  Based on this documentary evidence, the court concludes that Plaintiffs have met their burden of establishing that they are adequate class representatives.

The court considers this evidence on reply because there is no prejudice to Defendants in doing so.  *See In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 300 F.R.D. 347, 372 (C.D. Cal. 2013) (finding Plaintiffs to be adequate class representatives based in part on declarations submitted with their reply memorandum).  Indeed, Defendants have not yet deposed Plaintiffs and thus could not present deposition testimony to undermine or cast doubt upon Plaintiffs' declarations.  (See HNN Reply at 5.)  Further, if Defendants uncover evidence of Plaintiffs' inadequacy through additional discovery, Defendants may bring a motion to decertify pursuant to Rule 23(c)(1)(C).  *See* Fed. R. Civ. P. 23(c)(1)(C) (providing that "[a]n order that grants or denies class certification may be altered or amended before final judgment").  Accordingly, the court concludes that Plaintiffs have met their burden of demonstrating their adequacy as class representatives.

### b.  Typicality

To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class.  Fed. R. Civ. P. 23(a)(3).  The test for typicality is whether other class members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).  Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which the claim arose or the relief is sought.  *Id.*

1    HNN argues that Plaintiffs' claims are not typical because (1) Ms. Jammeh's

2    credibility will be a focus of the trial due to her alleged misrepresentation concerning her

3    marital status on her application for housing (*see* HNN Resp. at 11-13); and (2) Plaintiffs

4    may be subject to a defense under the RLTA because they were not current on their rent

5    and utilities when they quit the premises (*see id.* at 13-14 (citing RCW 59.18.080 (stating

6    that a tenant must be "current in the payment of rent including all utilities which the

7    tenant has agreed in the rental agreement to pay before exercising any of the remedies"

8    under the RLTA)).)

9    Claims that a class representative has credibility issues "must relate to issues

10   directly relevant to the litigation" or be confirmed examples of dishonesty such as a

11   criminal conviction for fraud to preclude class certification. *See Keegan v. Am. Honda*

12   *Motor Co.*, 284 F.R.D. 504, 525 (C.D. Cal. 2012) (internal quotations and citations

13   omitted).[17]   At a minimum, the attacks on the class representative's credibility must be

14   //

---

15   [17] The *Keegan* court dealt with the issue of the class representative's credibility under the
16   adequacy prerequisite of Rule 23(a)(4).  284 F.R.D. at 525-26.  Other courts have dealt with
     issues related to the class representative's credibility under the prerequisite of typicality. *See,*
17   *e.g.*, *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 633 (W.D. Wash. 2011) ("[T]he
     court is concerned that litigation concerning this defense will preoccupy Ms. Fosmire to the
18   detriment of the class claims irrespective of whether she ultimately prevails.  In addition, it
     threatens to undermine her credibility at trial, which also undermines the element of typicality.")
19   (citing *Drake v. Morgan Stanley & Co.*, No. CV 09-6467 ODW (RCx), 2010 WL 2175819, *5
     (C.D. Cal. Apr. 30, 2010)); *Troy v. Kehe Food Distributors, Inc.*, 276 F.R.D. 642, 654-55 (W.D.
20   Wash. 2011) (considering the plaintiff's credibility in determining whether the plaintiff's claims
     were typical of the class); *Chavez v. AmeriGas Propane, Inc.*, No. CV1305813MMMMANX,
21   2015 WL 12859721, at *31 (C.D. Cal. Feb. 11, 2015) (declining to find the plaintiff's claims
     were atypical due to the plaintiff's credibility issues).  This is not surprising because "[l]ike
22   commonality, typicality "tend[s] to merge with the adequacy-of-representation requirement[.]"
     *Dukes*, 564 U.S. at 350 n.5.  Thus, whether the court addresses this issue under the prerequisite
     of adequacy or typicality does not affect the analysis.

1 "so sharp as to jeopardize the interests of absent class members." *Harris v. Vector Mktg.*

2 *Corp.*, 754 F. Supp. 2d 996, 1015 (N.D. Cal. 2010). Here, HNN issued Plaintiffs a

3 three-day notice to quit their apartment. The issue of whether HNN's action in doing so

4 was justified based on Ms. Jammeh's alleged misrepresentation does not relate to an

5 element of Plaintiffs' RLTA and CPA claims. *See supra* § II.D. Further, HNN does not

6 identify any defense to which Ms. Jammeh's alleged misrepresentation would be

7 substantively material. In any event, HNN's attempt to rely on Plaintiffs' credibility to

8 undermine typicality rings hollow because HNN has not tested Plaintiffs' credibility by

9 deposing either one of them. (*See* HNN Reply at 5.) Based on the current record, the

10 court cannot conclude that Plaintiffs' credibility will become a focus of the trial, and

11 therefore does not conclude that Plaintiffs' claims are atypical on this basis.[18]

12 HNN also argues that Plaintiffs' claims are not typical because Plaintiffs will be

13 subject to a defense under RCW 59.18.080 for failing to pay all their rent and utility

14 charges. (HNN Resp. at 13-14.) This statutory provision requires a tenant to be "current

15 in the payment of rent including all utilities which the tenant has agreed in the rental

16 agreement to pay before exercising any of the remedies" under the RLTA. *See* RCW

17 59.18.080. Although Plaintiffs may be subject to this defense (HNN Resp. at 13), HNN

18 //

---

19 [18] HNN's reliance on *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 633 (W.D.

20 Wash. 2011), is misplaced. In *Fosmire*, the insurer argued that the named plaintiff made a material misrepresentation on her insurance application about whether her fiancé was a regular driver of her car. *See id.* A plaintiff's material misrepresentation on an insurance application

21 may give an insurer a defense to coverage. *See id.* As noted herein, HNN identifies no defense to Plaintiffs' claims under the CPA or the RLTA that turn on whether Plaintiffs' housing

22 application was accurate. (*See generally* HNN Resp.)

1    argues that other class members will be subject to this defense as well (*see id.* at 14

2    (stating that "an analysis would be required to assess whether each putative class member

3    . . . [was] current in rent and utility payments before having the ability to bring a claim

4    under the RLTA")).  A named plaintiff who is subject to the same defense as other class

5    members is typical.  *See Ellis*, 657 F.3d at 984; *see also Davis v. Homecomings Fin.*, No.

6    C05--1466 RSL, 2006 WL 2927702, at *5 (W.D. Wash. Oct. 10, 2006) ("[A]lthough the

7    presence of *unique* defenses can undermine the typicality element, [the defendant's]

8    defenses to plaintiff's claims are not unique."); *Lyon v. U.S. Immigration & Customs*

9    *Enf't*, 308 F.R.D. 203, 213 (N.D. Cal. 2015) ("[I]f other class members may be subject to

10   the same defenses as the representative plaintiff, such defenses are not "unique" and

11   therefore do not defeat typicality.") (citing *Ewert v. eBay, Inc.*, No. C-07-02193 RMW,

12   2010 WL 4269259, at *4 (N.D. Cal. Oct. 25, 2010); *Vedachalam v. Tata Consultancy*

13   *Servs., Ltd.*, No. C 06-0963 RMW, 2012 WL 1110004, at *10 (N.D. Cal. Apr. 2, 2012)).

14   Thus, the court concludes that HNN's argument concerning its defense under RCW

15   59.18.080 does not undermine the typicality of Plaintiffs' claims.  Having carefully

16   reviewed Plaintiffs' claims against HNN, the court concludes that Plaintiffs meet their

17   burden of demonstrating that their claims meet the Rule 23(a)(3) typicality prerequisite.

18        2.  CDR Class

19        CDR does not dispute that Plaintiffs satisfy the Rule 23(a)(1) numerosity

20   requirement; nor does CDR dispute the Rule 23(a)(4) adequacy of Plaintiffs' counsel.

21   (*See generally* CDR Resp.)  The court has examined Plaintiffs' proffer concerning these

22   prerequisites and agrees that they have met their burden concerning these prerequisites

1   for purposes of certifying the CDR class.  Accordingly, the court addresses only CDR's

2   challenges to commonality, typicality, and the adequacy of Plaintiffs as class

3   representatives.

4           a.  *Commonality*

5           Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R.

6   Civ. P. 23(a)(2).  The commonality requirement has "'been construed permissively' and

7   '[a]ll questions of fact and law need not be common to satisfy the rule.'"  *Ellis*, 657 F.3d

8   at 981 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998),

9   *overruled on other grounds by Dukes*, 654 U.S. 338).  However, "commonality requires

10  that the class members' claims 'depend upon a common contention' such that

11  'determination of its truth or falsity will resolve an issue that is central to the validity of

12  each claim in one stroke.'"  *Mazza*, 666 F.3d at 588 (quoting *Dukes*, 564 U.S. at 350)

13  (internal alteration omitted).  "This does not . . . mean that every question of law or fact

14  must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant*

15  question of law or fact.'"  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir.

16  2013) (quoting *Mazza*, 666 F.3d at 589) (emphasis added in *Abdullah*).

17          Plaintiffs argue that the CDR Class's common questions include:  (1) whether

18  CDR's policy of calculating interest on HNN's move-out charges from the date the tenant

19  moved out is permissible because the tenant does not know what those charges are until

20  he or she receives HNN's move-out statement and an explanation regarding the allocation

21  of the tenant's security deposit; (2) whether CDR violated the FDPCA, 15 U.S.C.

22  § 1692f(1), when CDR allegedly collected full balances assigned by HNN without

1  crediting class members for security deposits that HNN allegedly unlawfully forfeited;

2  (3) whether CDR violated the FDCPA, 15 U.S.C. § 1692e(2)(A), by making a false

3  representation about class members' debt for the same reasons as stated in question two;

4  (4) whether CDR violated the CAA, RCW 19.16.250(21), and *per se* violated the CPA,

5  RCW ch. 19.86, when it allegedly added impermissible interest to class members'

6  accounts; and (5) whether Mr. Wojdak is a debt collector under 15 U.S.C. § 1692a(6) and

7  is personally liable under the FDCPA for the attempts to collect and the collection of

8  allegedly unauthorized interest from class members.  (*See* MCC at 14-15.)

9         In its response, CDR does not challenge any of the common questions proffered

10  by Plaintiffs, argue that those questions are not common to all CDR Class members, or

11  that those questions are not sufficient to satisfy the requirements of Rule 23(a)(2).  (*See*

12  CDR Resp. at 20-21.)  Instead, CDR argues that the CDR Class lacks commonality based

13  on its disingenuous assertion that Plaintiffs expanded the CDR Class to include all kinds

14  of debt referred by any creditor.  (*See* CDR Resp. at 20-21.)  The court has already

15  rejected that argument and does so here as well.  *See supra* § III.B.2.  The court agrees

16  that the questions Plaintiffs identified are common to the CDR Class as modified by the

17  court, *see supra* § III.B.2, and that Plaintiffs satisfy Rule 23(a)(2)'s commonality

18  requirement.

19         *b.   Typicality*

20         Plaintiffs argue that their claims are typical of CDR Class members' claims

21  because CDR sent the same RO1 form letter to Plaintiffs—demanding the full principal

22  HNN assigned to CDR and interest calculated from Plaintiffs' move out date—that CDR

1   sent to all CDR Class members.  (MCC at 16.)  Plaintiffs assert that it is this letter which

2   gives rise to Plaintiffs' and the proposed CDR Class members' claims for violations of

3   the FDCPA, the CAA, and the CPA—satisfying the typicality argument.  (*See id.*); *see*

4   *also Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) ("Like the commonality

5   requirement, the typicality requirement is 'permissive' and requires only that the

6   representative's claims are 'reasonably co-extensive with those of absent class members;

7   they need not be substantially identical.'").

8       CDR responds by raising the same disingenuous argument that it raised in

9   response to Plaintiffs' class definition and Plaintiffs' arguments on commonality.  (CDR

10  Resp. at 22.)  Specifically, CDR argues that Plaintiffs' claims are not typical of class

11  members whose accounts were referred to CDR by entities other than HNN.  (*Id.* ("[T]he

12  purported class includes individuals whose accounts were referred to [CDR] by entities

13  other than HNN.").)  As discussed above, although this might create typicality issues if

14  Plaintiffs' CDR Class encompassed claims assigned by creditors other than HNN,

15  Plaintiffs' CDR Class does not contain any such claims.  *See supra* §§ III.B.2., III.C.2.a.

16  Further, to the extent that the CDR Class definition contained within Plaintiffs' class

17  certification motion could be interpreted to include such claims, the court has modified

18  the class definition to eliminate any such ambiguity.  *See supra* § III.B.2.  Thus, CDR's

19  argument does not undermine the court's conclusion that Plaintiffs satisfy the typicality

20  prerequisite of Rule 23(a)(3).

21      CDR also asserts that, although Plaintiffs' CPA claim is governed by a four-year

22  limitations period, a portion of the claims contained within Plaintiffs' CDR Class would

1    be barred by the FDCPA's one-year statute of limitations.  (*See* CDR Resp. at 22

2    ("[CDR] has a statute of limitations defense [applicable to FDCPA claims] to any

3    purported class member that it sent a letter to prior to July 12, 2018.") (citing 15 U.S.C.

4    § 1692k).)  This argument represents a more substantive challenge to the typicality

5    prerequisite.  Nevertheless, to satisfy the typicality requirement, Plaintiffs "need not

6    prove that [they are] immune from any possible defense, or that [their] claim will only

7    fail if every other class member's claim also fails." *Fitzhenry-Russell v. Dr. Pepper

8    Snapple Grp., Inc.*, 326 F.R.D. 592, 608 (C.D. Cal. 2018) (internal quotations and

9    citations omitted).  "Instead, [they] must establish that [they are] not subject to a defense

10   that is not typical of the defenses which may be raised against other members of the

11   proposed class." *Id.* (internal quotations and citations omitted).

12        With respect to a statute of limitations defense, some courts conclude that

13   typicality is not met when the named plaintiff faces a significant statute of limitations

14   problem that is not shared by other members of the putative class.  *See, e.g.*, *Plascencia v.

15   Lending 1st Mortg., LLC*, 259 F.R.D. 437, 444 (S.D. Cal. 2009) (concluding that the

16   typicality requirement was not met where the plaintiff's claim depended on an exception

17   to the statute of limitations and the limitations issue was "a major issue in the defense of

18   [that] claim").  However, a statute of limitations defense does not preclude class

19   certification where, like here, other members of the class may also be subject to the same

20   limitations defense as the class representative.  *See, e.g.*, *Corcoran v. CVS Health*, No.

21   15-cv-03504-YGR, 2019 WL 6250972, at *5 (N.D. Cal. Nov. 22, 2019) (concluding that

22   the typicality requirement was satisfied where, in view of a lengthy class period, other

1    class members were "very likely to be subject to the same statute of limitations defense

2    as both [class representatives]," and the class representatives therefore were not "*uniquely*

3    *subjected to the statute of limitations*"); *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558,

4    566 (S.D. Cal. 2012) (concluding that the named plaintiff's claims were typical despite

5    the possibility that some of her claims were subject to a time-barred defense).

6         Although CDR implies that Plaintiffs are subject to the FDCPA statute of

7    limitations, CDR makes no showing that Plaintiffs are uniquely subject to the FDCPA

8    limitations period.  (*See* CDR Resp. at 22.)  Indeed, CDR avers that other class members

9    are subject to the same defense.  (*See id.*)  As such, CDR's statute of limitations argument

10   fails to undermine typicality.  *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,

11   326 F.R.D. 592, 608 (N.D. Cal. 2018) ("To be typical, a class representative need not

12   prove that she is immune from any possible defense . . . . Instead, she must establish that

13   she is not subject to a defense that is not typical of the defenses which may be raised

14   against other members of the proposed class.") (internal quotations and citations

15   omitted).[19]  Accordingly, the court concludes that Plaintiffs have demonstrated that their

16   claims satisfy the typicality requirement of Rule 23(a)(3).

17   //

18

_____

19        [19] CDR relies upon *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).
     (*See* CDR Resp. at 22, n.66.)  The court ruled that the *Hanon* plaintiff did not satisfy the
20   typicality requirement because it was "predictable that a major focus of the litigation w[ould] be
     on a unique defense to him."  *Hanon*, 976 F.2d at 509.  Unlike the plaintiff in *Hanon*, CDR has
21   not asserted that Plaintiffs here are subject to any singular or unique defenses that would only
     apply to them.  (*See* CDR Resp. at 22 ("[CDR] has a statute of limitations defense to any
     purported class member that it sent a letter to prior to July 12, 2018.").)  Thus, *Hanon* is
22   inapposite.

1    Nevertheless, in response to CDR's statute of limitations typicality argument,

2   Plaintiffs suggest the creation of an FDCPA subclass (*see* CDR Reply at 5), and the court

3   agrees that the creation of such a subclass is a worthy consideration,[20] *see Borum v.*

4   *Brentwood Vill., LLC*, 324 F.R.D. 1, 8 (D.D.C. 2018) ("When appropriate, district courts

5   may redefine classes or subclasses sua sponte prior to certification."); *Santillan v.*

6   *Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005) ("A court may divide a class into

7   subclasses on motion of either party, or *sua sponte*."); *Murray v. Local 2620, Dist.*

8   *Council 57, Am. Fed'n of State, Cty., & Mun. Employees, AFL-CIO*, 192 F.R.D. 629, 635

9   (N.D. Cal. 2000) ("The court may [consider the creation of subclasses sua sponte] . . .

10   during the pendency of the case in response to factual developments that take place.").

11   Because the court has not heard from CDR on this issue, however, the court orders the

12   parties to provide briefing on the merits of creating an FDCPA subclass, how such a

13   subclass should be described, whether the subclass independently meets the requirements

14   of Rule 23, whether Plaintiffs must designate an additional named plaintiff for such a

15   subclass, and any other issues that the parties believe merit the court's attention

16   concerning such a subclass.  The court details the briefing schedule in the conclusion of

17   this order.

18   //

19   //

20

21   [20] CDR's data suggests that there are at least 750 HNN tenants accounts in the proposed FDCPA subclass.  (5/8/20 Chandler Decl. ¶ 2 ("[CDR's] data reflects the date on which it sent an RO1 letter to former tenant accounts placed by HNN. Columbia sent its initial letter to at least 757 former HHN tenants seeking to collect HNN accounts on or after July 12, 2018."); *see also id.* ¶ 2, Ex. 31.)

22

1       *c. Adequacy*

2       The court has already addressed the adequacy of Plaintiffs as representatives for

3 the HNN classes. *See supra* § III.C.1. The court sees no reason to alter that conclusion

4 regarding the adequacy of Plaintiffs as representatives for the CDR Class. Indeed,

5 CDR's argument that Plaintiffs are inadequate class representatives turns once again on

6 its disingenuous interpretation of the CDR Class definition, which the court has already

7 rejected. *See supra* §§ III.B.2., III.C.2.a-b. Accordingly, the court finds that Plaintiffs

8 have meet their burden of demonstrating that they are adequate class representatives

9 under Rule 23(a)(4).

10 **D.    Rule 23(b)(3)**

11       Having concluded that Plaintiffs met their burden of demonstrating the Rule 23(a)

12 prerequisites for class certification, the court now considers whether Plaintiffs have met

13 their burden of demonstrating that each of their proposed classes is appropriate for

14 certification under Rule 23(b)(3). Certification is appropriate under this provision if the

15 court finds that (1) "questions of law or fact common to members of the class

16 predominate over any questions affecting only individual members," and (2) "a class is

17 superior to other available methods for the fair and efficient adjudication of the

18 controversy." Fed. R. Civ. P. 23(b)(3). These two elements are referred to as

19 "predominance" and "superiority," respectively. The court will first address these Rule

20 23(b)(3) elements concerning the proposed HNN Classes and the CDR Class in turn.

21 //

22 //

1         1.   The HNN Classes

2             a.   The Move-In Form Class – Predominance

3         To assess Rule 23(b)(3) predominance, the court asks "whether proposed classes

4   are sufficiently cohesive to warrant adjudication by representation."  *In re Wells Fargo*

5   *Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009)), *abrogated on*

6   *other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  The court focuses on

7   whether "common questions present a significant aspect of the case and they can be

8   resolved for all members in the class in a single adjudication"; if so, "there is clear

9   justification for handling the dispute on a representative rather than on an individual

10  basis."  *Walker v. Life Ins. Co. of the Sw*, 953 F.3d 624, 630 (9th Cir. 2020) (quoting

11  *Hanlon*, 150 F.3d at 1022).  A common question for purposes of the Rule 23(b)(3)

12  predominance test "is one where the same evidence will suffice for each member to make

13  a prima facie showing or the issue is susceptible to generalized, class-wide proof."  *Tyson*

14  *Foods, Inc. v. Bouaphakeo*, --- U.S. ---, 136 S. Ct. 1036, 1045 (2016) (internal quotations,

15  citations, and alterations omitted).  The assessment of predominance "begins, of course,

16  with the elements of the underlying cause of action."  *Stearns*, 655 F.3d at 1020 (quoting

17  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

18       The Move-In Form Class is based on HNN's alleged violation of a provision of

19  the RLTA—RCW 59.18.260.  Under RCW 59.18.260, a landlord may not collect a

20  deposit unless the landlord provides the tenant at the start of the tenancy "a written

21  checklist or statement specifically describing the condition and cleanliness of or existing

22  damages to the premises and furnishings, including but not limited to, walls, floors,

countertops, carpets, drapes, furniture, and appliances." RCW 59.18.260.  A landlord

who collects a deposit without providing such a written checklist or statement is liable to

the tenant for "the amount of the deposit."  *Id.*  Plaintiffs argue that the predominance

requirement of Rule 23(b)(3) is satisfied for the Move-In Form Class because HNN used

a uniform Move-In/Move-Out Inspection form throughout the class period.  (*See* 4/16/20

Chandler Decl. ¶ 20, Ex. 19 at HNN000346-47.)  Plaintiffs allege that HNN employees

used these forms per HNN's standard Move-In/Move-Out Inspection form policy but that

the policy provides no direction as to how to complete the form so that it complies with

the statutory requirements.[21]  (*See id.* ¶ 22, Ex. 21.)  Plaintiffs argue that the court can

look at this form and determine if it fails to comply with the statute because it does not

specifically address the conditions of the walls, floors, countertops, carpets, and

appliances as required by RCW 59.18.260.  Plaintiffs acknowledge that in some cases

HNN employees handwrote additional detail on the Move-In/Move-Out Inspection form,

but nevertheless assert that HNN employees failed to do so in Plaintiff's case and in most

cases.  (*See* MCC at 19.)  Finally, Plaintiffs produced a summary exhibit which identifies

thousands of former HNN tenants by a unique identifier HNN assigned to them whose

forms Plaintiffs allege do not describe the elements required by RCW 59.18.260.

(4/16/20 Boschen Decl. ¶¶ 3-13, Ex. A.)

//

//

---

[21] In contrast, the form HNN began using in February 2019 does contain a detailed checklist addressing each item listed in RCW 59.18.260.  (4/16/20 Chandler Decl. ¶ 21, Ex. 20; HNN 30(b)(6) Dep. at 151:13-152:11.)

1    HNN responds that Plaintiffs' theory does not demonstrate predominance because

2    it will require individual reviews of every tenant file to determine whether HNN provided

3    Move-In Forms Class members with a checklist or statement that was RCW 59.18.260

4    compliant.  (HNN Resp. at 16-18.)   Yet, Plaintiffs already reviewed the completed forms

5    for proposed class members and produced an exhibit listing thousands of forms that they

6    allege fail to state the conditions of wall, floors, countertops, carpets, and appliances.

7    (4/16/20 Boschen Decl. ¶¶ 3-13, Ex. A.)  In response, HNN has not proffered any

8    contradictory evidence; instead HNN speculates that the forms may have varying levels

9    of specificity.  (*See* HNN Resp. at 18 ("The inspection forms inherently vary in level of

10   detail given that the forms are completed by inspectors making notations in "boxes" as

11   they are inspecting a unit.").)  If HNN could demonstrate that some of the forms

12   identified by Plaintiffs met the statutory standard, HNN presumably would have

13   proffered at least some examples to the court.  So far, however, HNN has not identified

14   even one such form.  Because courts ordinarily "do not consider defenses that a

15   defendant 'might advance for which it . . . present[s] no evidence,'" HNN's argument in

16   this regard does not defeat Plaintiffs' demonstration of predominance for the Move-In

17   Class.  *See Esparza v. SmartPay Leasing, Inc.*, No. C 17-03421 WHA, 2019 WL

18   2372447, at *4, n.2 (N.D. Cal. June 5, 2019) (quoting *True Health Chiropractic, Inc. v.*

19   *McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018)).  Accordingly, the court concludes

20   that Plaintiffs satisfy the Rule 23(b)(3) predominance requirement for the Move-In Forms

21   Class.

22   //

ORDER - 42

1          *b.   The Late Statement Class – Predominance*

2          The Late Statement Class is based on HNN's alleged violation of a provision of

3  the RLTA—RCW 59.18.280.  Under RCW 59.18.280(1), "the landlord shall give a full

4  and specific statement of the basis for retaining any of the deposit together with the

5  payment of any refund due the tenant under the terms and conditions of the rental

6  agreement" within 21 days of the tenant's move out date.  A landlord who fails to comply

7  with the terms of RCW 59.18.280(1) may raise the defense that "circumstances beyond

8  the landlord's control prevented the landlord from providing the statement within twenty-

9  one days."  RCW 59.18.280(2).  The landlord bears the burden of proof on this issue.  *See*

10 *id.*; *see also Goodell v. Madison Real Estate*, 362 P.3d 302, 308 (Wash. Ct. App. 2015).

11         HNN tracks its processing of tenant move outs in Excel workbooks.  (*See* Nored

12 Dep. at 23:11-43:6 (discussing HNN Move-Out Lists).)  That data includes the date of the

13 move out and the date the move out packet was approved, which is the earliest date HNN

14 would send a move out statement to a former tenant.  (*See id.* at 28:3-23, 34:15-35:7.)

15 Plaintiffs analyzed HNN's data and—using the earliest non-revision approval dates—

16 identified more than 500 people, including Plaintiffs, to whom HNN sent an initial move

17 out statement more than 21 days after they moved out.  (4/16/20 Boschen Decl.

18 ¶¶ 19-29.)  Plaintiffs argue that their use of this common evidence—HNN's own data—

19 to prove that HNN violated RCW 59.18.280(1) and is liable to the Late Statement Class

20 members for the full amount of their deposits demonstrates Rule 23(b)(3) predominance.

21 (*See* MCC at 20.)

22 //

1          HNN asserts that an affirmative defense under RCW 59.18.280(2)—that its

2    reasons for sending the statement late were outside of its control—raises individual issues

3    that defeats predominance.  (HNN Resp. at 19-21.)  First, as Plaintiffs point out, HNN did

4    not plead this affirmative defense.  (*See* Def. Answer (Dkt. # 31) ¶¶ 8.1-8.15.)

5    Nevertheless, HNN provides the declaration of Phil Nored, who lists situations that might

6    give rise to a defense under RCW 59.18.280(2).  (*See generally* 5/4/20 Nored Decl. (Dkt

7    # 72).)  Mr. Nored, however, provides no documentation to back up his testimony

8    concerning HNN's purported defense under RCW 59.18.260(2).  (*See generally id.*)  He

9    states that he reviewed documents showing that HNN's failure to provide the timely

10   notice was the result of other's actions, but he fails to identify those documents, disclose

11   whether HNN produced those documents to Plaintiffs, or attach any of those examples to

12   his declaration.[22]  (*See id.* ¶¶ 8, 11, 15-16, 18 (discussing his review of certain

13   documents).)  Mr. Nored posits hypothetical situations, such as the necessity of obtaining

14   contractor bids to repair damage to apartments, unsupported by any documentation (*see*

15   *id.* ¶¶ 7-14, 17), and fails to specifically identify a single tenant on Plaintiffs' class list

16   that is subject to the claimed defense (*see generally id.*).  Mr. Nored's testimony about a

17   potential, unpled defense does not undermine Plaintiffs' demonstration of predominance.

18   *See True Health Chiropractic*, 896 F.3d at 932 ("[W]e do not consider . . . defenses that

19   [a defendant] might advance or for which it has presented no evidence.") (citing *Bridging*

20

21          _____

       [22] He also states that he identified instances within Plaintiffs' Move-Out Class list "where
       the tenant's move-out statement was actually sent within 21-days after the tenant moved out."

22   (Nored Decl. ¶ 6.)  However, he fails to specifically identify even one of these individuals.  (*See*
       *generally id.*)

1   *Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) ("We are

2   unwilling to allow such speculation and surmise to tip the decisional scales in a class

3   certification ruling[.]" (internal quotations and citations omitted)); *Esparza*, 2019 WL

4   2372447, at *4, n.2 ("'Because courts do not consider defenses that a defendant "might

5   advance or for which it has presented no evidence,' . . . these arguments do not defeat

6   class certification.") (quoting *True Health Chiropractic*, 896 F.3d at 932).

7           Further, the court notes that Mr. Nored's declaration is at odds with HNN's Rule

8   30(b)(6) testimony is some respects.  HNN's Move-Out Process and Move-Out

9   Accounting Process policy documents describe steps from move out to sending the move

10  out statement, but those documents never mention the possibility of obtaining contractor

11  bids or the necessity of discussions with community organizations.  (4/16/20 Chandler

12  Decl. ¶¶ 23, 26, Exs. 22, 25.)  HNN's Rule 30(b)(6) deponent testified that HNN

13  employees used HNN's "Move-Out Cost Repair and Replacement Cost Estimates" form

14  and "industry knowledge" to decide what to charge tenants for damages, not contractor

15  bids.  (HNN 30(b)(6) Dep. at 156:16-157:8, 161:6-14, 162:9-163:11; *see also* 5/8/20

16  Chandler Decl. ¶ 9, Ex. 36 (attaching a copy of the form).)  For example, HNN charged

17  Plaintiffs $250.00 for carpet cleaning based on HNN's own estimate from the "Move-Out

18  Repair [And] Replacement Cost Estimate" form, and HNN did not get an actual invoice

19  for the carpet cleaning until after processing Plaintiffs' move-out.  (HNN 30(b)(6) Dep. at

20  161:6-14.)  The actual invoice was for only $135.00.  (*See id.*)  Nevertheless, HNN did

21  not revise the amount it charged Plaintiffs for carpet cleaning.  (*Id.* at 161:15-19.)

22  Because Mr. Nored's declaration is at odds in significant respects with HNN's Rule

1    30(b)(6) deponent's testimony, the court gives Mr. Nored's declaration less weight and

2    concludes that Mr. Nored's declaration does not undermine Plaintiffs' demonstration of

3    predominance with respect to the Late Statement Class.  In sum, the court concludes that

4    Plaintiffs have met their burden of demonstrating Rule 23(b)(3) predominance for the

5    Late Statement Class.

6           c.   *HNN's Proffered Defenses of Offset and RCW 59.18.080*

7           In addition to their foregoing arguments, HNN also argues that predominance is

8    lacking for both the Move-In Form Class and the Late Statement Class because RCW

9    59.18.080 requires a threshold inquiry to determine whether putative class members can

10   bring a RLTA claim and because the putative members of both classes are subject to

11   HNN's affirmative defense of offset.  (HNN Resp. at 14-15.)  The court is not convinced

12   but addresses each argument in turn.

13          RCW 59.18.080 states in pertinent part that "[t]he tenant shall be current in the

14   payment of rent including all utilities which the tenant has agreed in the rental agreement

15   to pay before exercising any of the remedies accorded him or her under the provisions of

16   this chapter."  RCW 59.18.080.  HNN argues this defense defeats Rule 23(b)(3)

17   predominance because whether the defense is applicable to Plaintiffs' RLTA claims will

18   necessarily require "an individual review of [the class members'] accounts and

19   cross-examination (*i.e.*, mini-trials) as to every single putative class member challenging

20   whether rent and utilities were due and owed."  (HNN Resp. at 14; *see also* 5/4/20 Nored

21   Decl. ¶ 26.)  Further, if HNN assigned the file to a collector, HNN argues that it would

22   //

1   need to contact the collector to see how much the collector had retrieved.  (*See* Nored

2   Decl. ¶ 26.)

3        In making this argument, HNN once again relies on the declaration of its

4   President, Mr. Nored.  (*See id.*)  As Plaintiffs point out, however, Mr. Nored's declaration

5   appears to be inconsistent with his prior deposition testimony regarding how difficult it

6   would be for HNN to obtain the needed information and in whose custody such

7   information resides.  (*See* HNN Reply at 7.)  Indeed, based on Mr. Nored's deposition

8   testimony, HNN appears to have the ability to readily retrieve the necessary information

9   from its own records.  Mr. Nored testified that HNN's Yardi system contains tenant

10  information going back to 2014, has significant reporting capabilities, and can be queried,

11  including queries about individual tenants.  (Nored Dep. at 47:24-49:24.)  Further, CDR,

12  which was HNN's only debt collector during the Move-In Form Class and the Late

13  Statement Class periods, sends HNN remittance reports each month that show the

14  amounts collected for a particular former tenant, along with account balances, and the

15  account' current status.  (Engberg Dep. at 167:4-14; 4/16/20 Chandler Decl. ¶ 35, Ex. 34

16  (attaching Ms. Sallah's statement).)  Thus, the court is not convinced that the information

17  to resolve this issue is difficult to retrieve or will result in disfavored mini-trials.

18       More fundamentally, Plaintiffs argue that an RCW 59.18.080 defense is not

19  applicable to Plaintiffs' claims under RCW 59.18.260 and RCW 59.18.280.  (HNN Reply

20  at 6-7.)  Although the court does not resolve dispositive issues on a Rule 23 certification

21  //

22  //

1   inquiry,[23] whether RCW 59.18.080 applies to Plaintiffs' RLTA claims under RCW

2   59.18.260 and RCW 59.18.280 is an issue that could be decided on a class-wide basis.  If

3   the defense does not apply, HNN's concerns would be irrelevant.  If the defense does

4   apply, then the court can reassess certification of the Move-In Form and the Late

5   Statement Classes at that time, if necessary.  *ConocoPhillips Co.*, 593 F.3d at 809 ("[A]

6   district court retains the flexibility to address problems with a certified class as they arise,

7   including the ability to decertify.").

8        Next, HNN argues that predominance does not exist because it has the right to

9   pursue the affirmative defense of offset against all putative class members in the Move-In

10  Form and the Late Statement Classes.  (HNN Resp. at 14-15.)  As Plaintiffs again point

11  out, however, HNN failed to plead this affirmative defense (*see* Def. Answer

12  ¶¶ 8.1-8.15), and offset is an affirmative defense that must be pled or it is waived, *see*

13  *Wapato Heritage LLC v. Evans*, 430 F. App'x 557, 559 (9th Cir. 2011) ("[The defendant]

14  waived the affirmative defense of offset . . . by not pleading in her answer the theory she

15  planned to argue at trial.") (citing *Locke v. City of Seattle*, 137 P.3d 52, 61 (Wash. Ct.

16  App. 2006) (stating that offset is an affirmative defense to be pled in the answer)).

17  Although the court also does not resolve the validity of HNN's offset issue in the context

18  of this motion, HNN's failure to plead offset undermines its argument that this

19

20        [23] *See United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv.*
    *Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010)
21  ("But a court can never be *assured* that a plaintiff will prevail on a given legal theory prior to a
    dispositive ruling on the merits, and a full inquiry into the merits of a putative class's legal
22  claims is precisely what both the Supreme Court and we have cautioned is not appropriate for a
    Rule 23 certification inquiry.").

1    affirmative defense precludes a finding of predominance under Rule 23(b)(3).  In any

2    event, offset goes to the calculation of damages, which is not an individual issue that

3    undercuts predominance.  *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155

4    (9th Cir. 2016) ("We have repeatedly confirmed the . . . holding that the need for

5    individualized findings as to the amount of damages does not defeat class certification.")

6    (citing cases).  Accordingly, the court concludes that Plaintiffs have sufficiently

7    demonstrated Rule 23(b)(1) predominance for both the Move-In Form and the Late

8    Statement Classes.

9              *d.  The Forfeiture Class – Predominance*

10             Plaintiffs claim that it was unfair and a violation of the CPA for HNN to forfeit a

11   former tenants' deposit, while still pursuing full actual damages flowing from its former

12   tenant's alleged breach of the lease, including future rent, payment for damage to the

13   apartment, any legal fees associated with eviction, and other charges.  Plaintiffs argue

14   that their Forfeiture Class meets Rule 23(b)(3)'s predominance requirement because

15   common evidence establishing HNN's forfeiture practices are found in its form

16   documents and testimony.  (*See* MCC at 21 (citing 4/16/20 Chandler Decl. ¶ 18, Ex. 24

17   (describing scenarios in which HNN employees should "forfeit" a tenant's deposit on

18   move out); Dean Dep. at 45:15-49:11 (testifying about the forfeiture of Plaintiffs' deposit

19   and that HNN forfeits deposits for failure to comply with the lease terms).)  The court has

20   examined Plaintiffs' proffer and agrees that Plaintiffs demonstrate Rule 23(b)(3)

21   predominance for the Forfeiture Class.

22   *//*

1    HNN argues that Plaintiffs' Forfeiture Class is flawed because Plaintiffs cannot

2    demonstrate "damages" for their CPA claim.  (HNN Resp. at 21-22.)  HNN argues that

3    no putative Forfeiture Class member is injured because "a class member's damages is

4    inherently tied to the amounts they owed HNN for damages to their unit, unpaid rent, and

5    other charges."  (*Id.* at 22.)  HNN argues that a member of the Forfeiture Class "could

6    only be damaged, if at all, if the 'forfeited' security deposit plus the amounts paid to

7    HNN exceeded the amount of damages incurred by HNN."  (*Id.*)  Plaintiffs respond that,

8    although injury to business or property is one of the five elements of a CPA claim,

9    "damages" is not.  (HNN Reply at 11 (citing *Panag v. Farmers Ins. Co. of Wash.*, 204

10   P.3d 885, 899 (Wash. 2009) ("Injury is distinct from damages.")).)  Plaintiffs respond

11   that HNN's former tenants were injured when HNN demanded the amount it claimed

12   without crediting the former tenants for the deposits they had already paid.  (*See id.*)

13   The court notes that, like HNN's defense based on RCW 49.18.080, whether the

14   forfeiture of a security deposit constitutes an injury under the CPA is an issue that could

15   be decided on summary judgment on a class-wide basis.  As such, the court does not

16   resolve the issue here, *see supra* n.19, and the issue does not undermine Plaintiffs'

17   demonstration of predominance, *see In re Optical Disk Drive Litig.*, No.

18   10-md-02143-RS, 2017 WL 6448192, at *2 (N.D. Cal. Dec. 18, 2017) ("Those

19   arguments, however, go to whether [the defendants] are entitled to summary

20   judgment . . . . They are not dispositive on the question of whether class certification is

21   appropriate.").  Accordingly, the court concludes that Plaintiffs have demonstrated Rule

22

1  23(b)(3) predominance for the Forfeiture Class.[24]  *See United States ex rel. Terry v.*

2  *Wasatch Advantage Grp., LLC*, 327 F.R.D 395, 415 (E.D. Cal. 2018) (certifying class of

3  former tenants in low-income housing and explaining that common questions about the

4  legality of their uniform lease provisions under the state's consumer protection law

5  predominate over any individual issues).

6          e.   *The HNN Classes – Superiority*

7          Rule 23(b) lists four factors relevant to determining superiority:  (1) "the class

8  members' interests in individually controlling the prosecution or defense of separate

9  actions"; (2) "the extent and nature of any litigation concerning the controversy already

10  begun by or against class members"; (3) "the desirability or undesirability of

11  concentrating the litigation of the claims in the particular forum"; and (4) "the likely

12  difficulties in managing a class action."  Fed. R. Civ. P 23(b)(3)(A)-(D).

13          Plaintiffs argue that all four factors support a finding of superiority here.  (MCC at

14  22-23.)  First, Plaintiffs note that the proposed HNN class members consist of more than

15  a thousand former tenants in low-income housing complexes seeking to recover small

16  amounts—such as security deposits of either $400.00 or $700.00 and interest charges on

17  balances that are typically below $10,000.00.  *See Terry*, 327 F.R.D at 418 (finding

18  superiority when the proposed class was hundreds of former low-income housing tenants

19

20  _____

    [24] HNN also asserts that it will raise an offset affirmative defense against Forfeiture Class
    members.  (HNN Resp. at 22 ("[E]ven if these class members could claim a CPA violation, they

21  would be subject to offset for claims by HNN for any unpaid balance which inherently involves
    individualized inquiries.").)  For the same reasons that the court rejected HNN's offset argument
    as undermining predominance regarding the Move-In Form and the Late Statement Classes, it

22  also rejects those arguments here.  *See supra* § III.D.1.c.

seeking damages of a few thousand dollars each).  Concentrating thousands of similar

and relatively small value claims in one class action is superior to the adjudication of

thousands of individual actions.  *See Local Joint Exec. Bd. of Culinary/Bartender Tr.*

*Fund v. L.V. Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (cases involving "multiple

claims for relatively small individual sums" are particularly well suited to class

treatment).  Further, as described herein, Plaintiffs have identified numerous issues

amenable to possible summary judgment in this matter.  No party has raised the

possibility of other litigations involving HNN's move-out practices or its collection and

retention of security deposits.  Finally, Plaintiffs argue that, because all HNN properties

are in Washington State, this is a desirable forum for the litigation.

HNN challenges only the first and fourth factors relevant to superiority—the class

members' interest in individually controlling the prosecution of their claims and the

manageability of a class action.  (*See* HNN Resp. at 23-24.)  In doing so, HNN rehashes

its arguments concerning predominance.  (*See id.*)  For the same reasons that the court

rejected HNN's arguments concerning predominance, it rejects them in the context of

analyzing superiority as well.  *See supra* §§ III.D.1.a.-III.D.1.d.  In arguing that the court

should find that the HNN Classes lack superiority, HNN relies on *Wetzel v. CertainTeed*

*Corp.*, No. C16-1160JLR, 2019 WL 3976204, at \*18-21 (W.D. Wash. Mar. 25, 2019).

(*See* HNN Resp. at 23.)  However, *Wetzel* is inapposite.  The former low-income housing

tenants here are unlike the homeowners in *Wetzel* with claims of more than $10,000.00

each.  *See Wetzel*, 2019 WL 3976204, at \*18.  "[W]hen the individual damages suffered

//

by each class member are relatively low," as they are here, "[t]he first factor [of

superiority] weighs in favor of certifying a class." *See id.*

HNN also relies on *Wetzel* to argue that the court should deny class certification

on manageability grounds.  (HNN Resp. at 12.)  However, *Wetzel* is again

distinguishable.  The manageability concerns the *Wetzel* court identified involved

difficulties in identifying and locating absent class members.  2019 WL 3976204, at

*19-20.  Here, Plaintiffs have already analyzed HNN's data and provided a list of

members for each proposed class.  (4/16/20 Boschen Decl. ¶¶ 3-19, Exs. A-C.)  HNN

offers no critique of that analysis.  (*See generally* HNN Resp.)  The court concludes that

Plaintiffs have demonstrated Rule 23(b)(3) superiority for each of the HNN Classes.

2.   The CDR Class

a.  *Predominance*

Plaintiffs maintain that whether CDR violated the FDCPA, the CAA, and the CPA

by attempting allegedly to collect amounts not legally due are predominant legal

questions.  The FDCPA is a strict liability statute, *Cruz v. Int'l Collection Corp.*, 660

F.3d 991, 997 (9th Cir. 2012), and Congress expressly recognizes the propriety of class

actions to enforce the FDCPA by including damages provisions that apply only to

certified classes, *see* 15 U.S.C. §§ 1692k(a)-(b).  The FDCPA prohibits a debt collector

from making a false representation of the character, amount, or legal status of any debt.

15 U.S.C. § 1692e(2)(A).  In addition, the FDCPA prohibits collecting any amount not

authorized by the agreement creating the debt or permitted by law.  15 U.S.C. § 1692f(1).

Similarly, the CAA prohibits a licensed collection agency from collecting or attempting

1  to collect amounts other than "allowable interest."  RCW 19.16.250(21).  Further, a

2  licensed collection agency's commission of a practice prohibited by the CAA is a *per se*

3  unfair or deceptive act or practice occurring in trade or commerce of the CPA.  RCW

4  19.16.440.

5       Defendants admit that CDR is a collection agency.  (Def. Answer ¶ 3.6.)  Thus,

6  whether CDR violated the FDCPA or the CAA by charging interest on balances before

7  HNN informed Plaintiffs of the amounts due is a question of law that can be answered the

8  same way for the entire CDR Class.  Similarly, whether CDR violated the FDCPA or the

9  CAA by collecting amounts HNN assigned to CDR while allegedly knowing that HNN

10  had not credited former tenants the amount of their security deposit is also a common

11  legal question.

12       Finally, whether Mr. Wodjak is a debt collector because he exercised control over

13  the affairs of CDR or was regularly engaged, directly and indirectly, in the collection of

14  debts is a common question that may be determined on a class-wide basis.  *See Jenkins v.*

15  *Puckett & Redford PLLC*, No. 2:19-CV-01550-BJR, 2020 WL 4517933, at *9 (W.D.

16  Wash. Aug. 3, 2020) ("While the Ninth Circuit has not yet decided whether an individual

17  employee of a debt collecting corporation may be held personally liable as a 'debt

18  collector' under the FDCPA, the Sixth Circuit and a majority of District Courts within the

19  Ninth Circuit have concluded that individual employees of a debt collecting corporation

20  can be held personally liable under the FDCPA without piercing the corporate veil, and

21  the Court is persuaded by their holdings."); *see also Moritz v. Daniel N. Gordon, P.C.*,

22  895 F. Supp. 2d 1097, 1109 (W.D. Wash. 2012) ("[C]ourts have found an individual

1    personally liable [as a debt collector under the FDCPA] if "the individual . . . exercised

2    control over the affairs of the business . . . or . . . was regularly engaged, directly and

3    indirectly, in the collection of debts.") (internal quotations and citations omitted).  Indeed,

4    this last issue is already before the court in the form of Mr. Wodjak's motion for

5    summary judgment.  (*See* Wodjak MSJ (Dkt. # 51).)  Mr. Wodjak of course maintains

6    that the answer to this question is "no" (*see generally id.*; *see also* CDR Resp. at 28), but

7    irrespective of the court's ultimate decision, it remains a class-wide determination.[25]

8        CDR nevertheless argues that individual questions will predominate concerning

9    Plaintiffs' CDR Class.  (CDR Resp. at 23-28.)  Most of CDR's arguments concerning

10   Rule 23(b)(3) predominance relate to its overly broad interpretation of the CDR Class

11   and raise issues of different types of debt and differences in lease terms that might exist if

12   the Class were as broad as CDR suggests.  (*See id.* at 24, 26-27.)  As noted above, the

13   court has already rejected CDR's interpretation of the CDR Class and adjusted that

14   definition accordingly.  *See supra* §§ III.B.2., III.C.2.a-c.

15       CDR also argues that the court will be required to make individualized inquiries

16   into when each CDR Class member "was made aware of" or "had known of" the debt and

17   accumulated interest charges, as well as individualized inquiries into the circumstances of

18   each CDR Class member's move out.  (CDR Resp. at 25, 27.)  However, CDR does not

19   adequately explain why these inquiries would be necessary, and in any event, the court is

20

21       [25] If the court ultimately determines that Mr. Wodjak's FDCPA liability turns on whether
     he was involved with individual accounts, the court can reassess the applicability of the CDR
22   Class to him at that time.  *See ConocoPhillips Co.*, 593 F.3d at 809 ("[A] district court retains the
     flexibility to address problems with a certified class as they arise . . . .").

1    not convinced.  Plaintiffs argue that HNN's move-out charges are not liquidated[26] so that

2    Washington's prejudgment interest statute does not authorize adding interest to those

3    charges.  (*See* CDR Reply at 7.)  Plaintiffs also argue that even if interest is authorized,

4    the earliest date on which the amount could be deemed liquidated is the day that HNN

5    sent notice of the charges to CDR Class members because debtors are not required to pay

6    interest until they are able to ascertain the amount owed.  (CDR Reply at 7); *see also*

7    *Hansen v. Rothhaus*, 730 P.3d 662, 665 (Wash. 1986) ("A defendant should not,

8    however, be required to pay prejudgment interest in cases where he is unable to ascertain

9    the amount he owes to the plaintiff.").  Plaintiffs argue persuasively that this information

10   can be retrieved from HNN's records and will not require any individualized inquiries.

11   Thus, the court concludes that Plaintiffs have met their burden of demonstrating Rule

12   23(b)(3) predominance with respect to the CDR Class.

13        *b.  CDR Class – Superiority*

14        For all the same reasons that the court found class litigation to be superior with

15   respect to the HNN Classes under Rule 23(b)(3), the court finds class treatment of the

16   CDR Class to be superior as well.  *See supra* § III.D.1.e; *see also* Fed. R. Civ. P.

17   23(b)(3).  In any event, CDR did not challenge the adequacy of Plaintiffs' assertion of

18   superiority or contend that any other method of litigating the CDR Class is superior to

19

20        [26] Although the court has not yet ruled on this issue, the court denied CDR's motion for
21   summary judgment on Plaintiffs' FDCPA and CAA claims in part because the court could not
     conclude that HNN's move-out charges were liquidated.  (*See* 6/17/20 Order (Dkt. # 91) at 18.)
     The inverse of this issue—whether HNN's move-out charges are not liquidated—has not yet
22   been presented to the court by way of a dispositive motion.  Nevertheless, this is an issue that
     may be capable of class-wide determination.

1  class resolution.  (*See generally* CDR Resp.)  Accordingly, the court concludes that

2  Plaintiffs have met their burden of demonstrating Rule 23(b)(3) superiority for the CDR

3  Class.

### IV.   CONCLUSION

5  Based on the foregoing analysis, the court concludes that Plaintiffs have

6  demonstrated all the elements required under Rule 23(a) and Rule 23(b)(3) for class

7  certification of the HNN Classes and the CDR Class, as modified by the court.

8  Accordingly, the court GRANTS Plaintiffs' motion for class certification (Dkt. # 54)

9  subject to the class description modifications described herein.  The certified classes are

10  as follows:

11  **HNN CLASSES**: Former tenants of an HNN managed property in
    Washington who moved in before February 1, 2019 and:

13  (1) who moved out on or after July 12, 2017, and from whom HNN collected
    a deposit or security without providing a move-in checklist that stated the
    condition of the walls, floors, countertops, carpets, and appliances in the unit
14  (the "Move-In Form" Class); or

15  (2) who moved out on or after July 12, 2017, and to whom HNN mailed a
    statement of HNN's basis for retaining a deposit more than 21-days after the
16  tenant moved out of an HNN-managed unit (the "Late Statement" Class); or

17  (3) who moved in to an HNN managed property after July 31, 2016, and
    whose deposit was forfeited by HNN (the "Forfeiture Class").

19  **CDR CLASS**: All former tenants of an HNN managed property in
    Washington whose accounts HNN placed with CDR between February 13,
    2017, and January 31, 2019, and to whom CDR sent at least one written
20  collection demand.

21  The certified claims are the First, Second, Third, and Fourth claims for relief set

22  forth in Plaintiffs' Second Amended Complaint.  (*See* SAC ¶¶ 6.1-6.56.)

1      The Court APPOINTS Plaintiffs Adama Jammeh and Oumie Sallah as

2   representatives of the Classes.  The Court appoints the Terrell Marshall Law Group, The

3   Law Office of Paul Arons, and Leonard Law as class counsel.  *See* Fed. R. Civ. P. 23(g).

4      As discussed above, the court ORDERS the parties to provide briefing on the

5   merits of creating an FDCPA subclass, how such a subclass should be described, whether

6   the subclass independently meets the requirements of Rule 23, whether Plaintiffs must

7   designate an additional named plaintiff for such a subclass, and any other issues that the

8   parties believe merit the court's attention concerning such a subclass.  Plaintiffs shall file

9   an opening memorandum concerning a possible FDCPA subclass no later than September

10  23, 2020, and shall limit the opening memorandum to no more than fifteen (15) pages.

11  Defendants shall file a responsive memorandum no later than October 7, 2020, and shall

12  limit the responsive memorandum to no more than fifteen (15) pages.  Plaintiffs shall file

13  a reply memorandum, if any, no later than October 14, 2020, and shall limit it to no more

14  than seven (7) pages.

15     The parties shall confer regarding the form of class notice and Plaintiffs shall

16  submit their proposed notice plan to the court within 20 days of the court's determination

17  //

18  //

19  //

20  //

21  //

22  //

ORDER - 58

1   concerning an FDCPA subclass and shall inform the court whether Defendants agree to

2   Plaintiffs' proposed plan.

3         Dated this 9th day of September, 2020.

4

5

6                                          JAMES L. ROBART
                                           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22